United States Court of Appeals

FOR THE EIGHTH CIRCUIT

_____

No. 95-2013

_____

Robert Don Arnold,                        *
                                          *
        Plaintiff - Appellee,             *
                                          *
        v.                                *
                                          *
Michael Groose, Dave Dormire,             *
Jack Kirk,                                *
                                          *
        Defendants,                       *    Appeal from the United States
                                          *    District Court for the
James Bohannon, James Eberle,             *    Western District of Missouri.
Arthur W. Dearixon,                       *
                                          *
        Defendants - Appellants,          *
                                          *
Robert Faith,                             *
                                          *
        Defendant.                        *


_____

Submitted:  January 10, 1996

Filed:  March 31, 1997

_____

Before LOKEN, REAVLEY,[1] and HANSEN, Circuit Judges.
_____


HANSEN, Circuit Judge.


        Robert Don Arnold, a Missouri inmate who is serving a life sentence
without parole for first degree murder at the Jefferson

_____

[1]The Honorable Thomas M. Reavley, United States Circuit Judge
for the Fifth Circuit, sitting by designation.

City Correctional Center (JCCC), filed this action under 42 U.S.C. § 1983, alleging, inter alia, that Lieutenant James Bohannon (an officer at JCCC) conspired with another inmate, Claude Woodard, to kill Arnold, and that Arthur W. Dearixon (the Chief Investigator at JCCC) and James Eberle (Chief of Security at JCCC) destroyed evidence of the conspiracy. A jury returned a verdict in favor of Arnold against the defendants, and the defendants appeal. We reverse and remand.

## I.

Viewing the evidence in the light most favorable to the jury's verdict, the jury could have found the following facts.

Arnold was transferred to the JCCC in 1991 and was assigned to housing unit 2A. At the time of Arnold's transfer, inmate Claude Woodard, a reputed prison drug dealer who had "dirt" on two or more guards, was the clerk of housing unit 2A. As clerk of the housing unit, Woodard had an office which had a second, secret, private phone line. Woodard used the secret phone for setting up drug deals and communicating with certain correctional officers.

Shortly after Arnold arrived, Arnold was appointed as the new housing unit clerk, replacing Woodard. Although Woodard had officially lost his position as the housing unit clerk, he retained his ability to move freely within the housing unit and to use the secret phone line in the housing clerk's office. Arnold overheard some of Woodard's conversations and learned that a particular officer, defendant Bohannon, was financing Woodard's drug dealings inside the prison. Arnold installed a wire tap on the secret phone line and connected it to a voice-activated tape recorder in his cell. Arnold recorded some incriminating telephone conversations

between Woodard and Bohannan and later, after filing this lawsuit, summarized them in a log.

At some point, Woodard asked Arnold to record some conversations for him. Woodard had been terminated from a maintenance job and wanted to lay the factual foundation for a lawsuit against certain prison officials. Arnold recorded two conversations relating to Woodard's loss of his prison job and later transcribed them into his log.

According to Arnold's testimony and his log, some of the conversations Arnold taped related to setting up drug transactions. During one phone call, Lieutenant Bohannon allegedly told Woodard, "It's here," and then hung up. (Trial Tr. at 112.) Arnold himself answered the phone on the next call and told Bohannon that Woodard had gone to pick up "that package." (Id.) Bohannon responded in an angry tone, "What do you know about it? Never mind," and hung up. (Id.) Bohannon later discussed with Woodard on the tapped phone the fact that Arnold knew of their dealings and ordered Woodard to murder Arnold. (Id. at 114-15.) All of these alleged conversations were supposedly recorded on Arnold's tape.

Upon listening to the recorded conversation in which Woodard and Bohannan discussed killing him, and knowing that Woodard had plans to kill another inmate the next morning, Arnold contacted a roving guard and asked to see someone about the matter. He was allowed to speak to the watch commander, who then referred Arnold to appellants Dearixon and Eberle. Upon hearing Arnold's story and receiving Arnold's tape, Dearixon and Eberle asked Arnold to give a written statement summarizing the facts and advised him not to tell anybody about the tape. Arnold completed his written statement and was transferred to segregated housing for his protection. So was Woodard. A day or two later, Arnold was

3

instructed to give another statement, this time making no reference to Bohannon. Arnold complied. At the time of trial, only the second statement remained in Arnold's file.

Arnold allegedly had made three copies of the original tape. He sent one to the Department of Justice in Washington, D.C., and one to the Federal Bureau of Investigation in Kansas City. Arnold was unable to produce these two copies at the trial. The custodian of the FBI's records testified that there was no tape recording of any kind in the FBI's file containing Arnold's letter, and that there was no mention of any tapes in Arnold's letter. Another copy, which Arnold had in his personal possession, was, according to Arnold, confiscated by a different prison official. The fourth tape, which Arnold had turned over to Eberle and Dearixon, was admitted into evidence at trial, and at that time, it contained only the two, nonincriminating telephone conversations; one between Woodard and Bohannon regarding Woodard's termination from his maintenance job, and one between Woodard and the living unit manager on the same subject.

During the time Arnold was segregated from the general population for his protection, he received several letters from Woodard (who was also in segregation) referring obliquely to taped telephone conversations and directly to Bohannan, who Woodard described as his "dirty ally." Arnold turned over these letters to Dearixon, and they were admitted at trial.

When Arnold was later released back into the general population, Woodard began to threaten Arnold's life. One morning, Woodard and several other inmates followed Arnold in a tunnel towards an unsupervised corner of the tunnel where many inmate stabbings have taken place. One of the inmates displayed a knife to Arnold. Arnold feared for his life, but when the inmates

4

rounded the corner, they saw an officer. The would-be assailants retreated.

Arnold filed this cause of action under 42 U.S.C. § 1983, claiming the appellants had violated his Eighth Amendment right against cruel and unusual punishment. The case went to trial, and the jury returned a verdict in favor of Arnold, assessing $15,000 in compensatory damages against the appellants. The appellants moved for an entry of judgment as a matter of law or, in the alternative, for a new trial. The district court denied the motion, and this appeal followed.

## II.

Although the appellants raise a number of issues, we find dispositive their argument that the district court committed reversible error in refusing to admit evidence the appellants sought to use to impeach Arnold. Due to our reversal and remand for a new trial, the district court may confront an instructional issue argued by the appellants. Thus, as a matter of prudence, we additionally examine the appellants' claim of instructional error.

**The Evidentiary Ruling**

In an effort to impeach Arnold, the appellants twice sought to admit portions of Arnold's handwritten pro se pleadings from an earlier suit (No. 91-4571) Arnold had filed arising out of the same nucleus of facts at issue in this case and which had been consolidated with the action tried (No. 92-4447). The district court refused to admit the evidence. The first attempt was during the cross-examination of Arnold when the defendants' counsel sought to use Arnold's third amended complaint as a prior inconsistent

5

statement.  Arnold's counsel's relevancy objection was sustained. With respect to the second attempt, during the defendants' case in chief, the trial transcript does not reveal either the grounds for the objection that was made by Arnold's counsel or the basis for the court's ruling excluding the evidence.

[DEFENDANTS' COUNSEL]:  At this time, Your Honor, on the question of injury, I want to read four statements that Mr. Arnold has written in his own hand filed in this courtroom and these are his various and sundry complaints.  I just want to read the paragraph relating to whether he suffered injury and in what manner he suffered an injury because the stories because -- four different stories.

[ARNOLD'S COUNSEL]:  Well, I object to it on several grounds and if we could approach the bench, I'd --

THE COURT:  I'll sustain.  I'm not going to let him read it.

[DEFENDANTS' COUNSEL]:  These are admissions and it goes directly to his damages.  The question of whether he, in fact, suffered an injury by virtue of any type of injury, from Claude Woodard, goes directly to --

THE COURT:  Let me see it.

BENCH CONFERENCE

[DEFENDANTS' COUNSEL]:  I'll show you my work product which is -- I've got the actual pleadings here.  What you basically have is the first time he wrote his statement in December of 1991, does never mention the fact that there was even a knife.  The next time he wrote a statement in July of 1992, he mentions that there was a threat to use a knife the next day.

[ARNOLD'S COUNSEL]:  What the h--- are these?

[DEFENDANTS' COUNSEL]:  There's an injury only by virtue of the terror and fear of immediate death.

COURT:  Objection be sustained.  I'm not going to let you read them.

6

(Trial Tr., Vol. 2, at 116-17.)

Defendants' counsel was later permitted to make a specific offer of proof of Arnold's previous written versions of the events at issue, but neither Arnold's counsel nor the court added anything at that time concerning what Arnold's objection was to the proffered evidence or what the reasons were for the court's exclusion. (Id. at 155-56.); see Fed. R. Evid. 103 (a)(2),(b).  The defendants filed a motion for new trial, claiming (among other things) that the exclusion of the proffered statements was prejudicial error.  It is only when the district court ruled on the motion for new trial that the court clarified its ruling, stating that it found the proffered evidence to be "irrelevant." (Appellant's App. at 200.)  At no time during trial was the proffered evidence attacked as being confusing for the jury under Federal Rule of Evidence 403.  The proffered evidence consisted of Arnold's handwritten pleadings (his original complaint, his request for a preliminary injunction, and his third amended complaint), which he had filed in the consolidated case (No. 91-4571) in the same district court.

We review a district court's decision to exclude evidence for a "`clear and prejudicial' abuse of discretion." Cummings v. Malone, 995 F.2d 817, 823 (8th Cir. 1993).  After carefully reading the entire record before us, we conclude that the district court's refusal to admit the proffered evidence in this case was a clear and prejudicial abuse of discretion.

This entire case depended on the credibility of Arnold's testimony. In turn, Arnold's claim of a conspiracy to murder him rests on (1) a tape that at trial contained only two benign conversations, but at some point allegedly contained conversations implicating Bohannon in drug dealing and conspiracy to murder

Arnold, and (2) Arnold's log of the conversations the tape had allegedly contained. The appellants claim the tape never contained any conversations about drug deals or about a conspiracy to murder Arnold, because no such conversations took place. The appellants also claim Arnold prepared the "log" out of whole cloth after he filed this action in preparation for this case. The determination of whether a conspiracy to murder Arnold existed turned on whether the jury found Arnold's testimony regarding the taped conversations and his transcription of their substance to be credible. Arnold's evidence of the act that put him in fear of imminent death similarly rests solely on a credibility determination of him, for his only evidence on this point is his own testimony that Woodard and his friends, armed with a knife, followed Arnold in the tunnel to a blind corner in an attempt to murder him.

The evidence the appellants sought to use to impeach Arnold reveals the evolving versions of Arnold's story, particularly with respect to the alleged attempted attack on Arnold in the tunnel. In Arnold's initial complaint in No. 91-4571, filed just two months after the alleged attempt to murder him in the tunnel, Arnold claimed that he had been subjected "to constant fear of harm by forcing me to go to general population when [the prison officials] knew there was a problem with another inmate and by placing me back in the same housing unit with that inmate." (Appellant's App. at 29.) However, in his lengthy rendition of the facts supporting his initial complaint, he makes no mention of Woodard by name, and absolutely no mention of Woodard and his friends armed with a knife following him down the tunnel. Neither is there any mention of any tape-recorded conversations between Bohannon and Woodard wherein Bohannon ordered Woodard to kill Arnold. If in fact those omitted events had indeed occurred, one would assume they would have been the most important facts to recite in support of his claim that he had been "subjected to a constant fear of harm." There are also

discrepancies between the versions about whether the attempted attack took place in the morning or the evening, and when he reported the threat to kill him, which leads to the question of whether Arnold is claiming the foiled attack transpired at the time he was actually in protective custody. The jury's credibility determination of Arnold's testimony concerning the attempted attack was of paramount importance, for if the attempt did not take place, Arnold has failed to state an Eighth Amendment claim. See Hopson v. Fredericksen, 961 F.2d 1374, 1378-79 (8th Cir. 1992) (explaining the "terror of instant and unexpected death" doctrine under Burton v. Livingston, 791 F.2d 97 (8th Cir. 1986)).

Arnold's prior written versions of the facts were, for evidentiary purposes, admissions by a party opponent under Federal Rule of Evidence 801(d)(2)(A). They were offered against Arnold, a party opponent, and they were his own handwritten statements submitted earlier to the court, at least the first of which was made under penalty of perjury. Contrary to the district court's view, we believe the excluded admissions were relevant because they were inconsistent both with Arnold's later version contained in his handwritten complaint in No. 92-4447 and with his trial testimony. To have evidentiary value for its inconsistency, the contradiction need not be direct. "The cases have developed a standard of minimal inconsistency, under which almost any divergence will suffice to permit use of the prior statement." 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence, ¶ 801(d)(1)(A)[01], at 801-142 (1996). "It is enough if the proffered [statement] taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict." United States v. Barrett, 539 F.2d 244, 254 (1st Cir. 1976) (quoting Commonwealth v. West, 45 N.E.2d 260, 262 (Mass. 1942)) (emphasis added); accord Kenneth S. Broun, et al., McCormick on Evidence

§ 34, at 46 (John William Strong, ed., 4th ed. 1992) ("Accordingly, if the former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent."); C. Mueller & L. Kirkpatrick, 4 Federal Evidence § 402, at 164 (2d ed. 1994) (The requirement of inconsistency is satisfied "if one includes a point that the other omits or if one is pointed and specific while the other is qualified and general."). Arnold's prior pleadings fit that test. Cf. United States v. Bigham, 812 F.2d 943, 946 (5th Cir. 1987).

Arnold argues that the various versions of the alleged events are not inconsistent but are compatible, and therefore, the district court properly concluded that their probative value is substantially outweighed by the danger of confusing the jury. We respectfully disagree, first, because the trial court did not rest its decision on confusion but rather on relevancy, and second, if the versions are compatible and not inconsistent, the prospects for confusion are lessened, not heightened. In our view, the excluded evidence was highly probative and relevant to the credibility determinations on which this case depended. After hearing how little of the presently submitted facts exists in the earlier versions of Arnold's story, a reasonable jury could well question the veracity of Arnold's testimony in this case. Although we agree with Arnold's counsel that comparing the facts recited in the pleadings of Arnold's other lawsuit to those of this case could be somewhat confusing, this confusion stems principally from the discrepancies in Arnold's story -- which is precisely why the evidence is highly probative of his credibility. We hold that any potential confusion resulting from the admission of portions of the pro se pleadings from Arnold's other suit does not substantially outweigh the extremely high probative value of the evidence, see Rule 403, and the district court's refusal to admit the prior

versions as admissions was a clear and prejudicial abuse of discretion. Cf. Cummings, 995 F.2d at 825 (finding that a district court abused its discretion by refusing to admit evidence of prior inconsistent statements based on confusion under Rule 403 when the credibility of the witness was paramount to the case). Accordingly, we reverse the jury's verdict in favor of Arnold and remand for a new trial.

**JURY INSTRUCTIONS**

We now address the instructional issue the appellants have raised. The appellants contend that the district court erred by failing to instruct the jury that the appellants must have acted "maliciously and sadistically" in order to be liable. The district court rejected this instruction, reasoning that an instruction on intent to murder includes, by it own terms, a malicious and sadistic intent.

The district court instructed the jury that in order to find Bohannan liable, it had to find:

> First, the defendant Bohannan and inmate Woodard had a mutual understanding; and second, the purpose of the mutual understanding between defendant Bohannan and Inmate Woodard was to murder the plaintiff; and third, that either defendant Bohannan or Inmate Woodard did act in furtherance of the conspiracy to murder the plaintiff. And fourth, as a direct result, the plaintiff suffered terror of instant and unexpected death sufficient to cause him injury.

(Trial Tr. at 2-160 to -61.) The court further instructed the jury that it should find Eberle liable only if it concluded:

11

> First, defendant Eberle knew of the conspiracy to kill plaintiff; and second, defendant Eberle acted in furtherance of this conspiracy by destroying a portion of the tape; and third, that as a direct result the plaintiff suffered terror of instant and unexpected death sufficient to cause him injury.

(Id. at 161.) The court gave an identical jury instruction concerning Dearixon's potential liability, except that the instruction used Dearixon's name instead of Eberle's. (See id. at 161-62.)

"A district court has broad discretion when framing jury instructions . . . ." Howard v. Barnett, 21 F.3d 868, 871 (8th Cir. 1994). That discretion is abused when the instructions as a whole do not "accurately and adequately state the applicable law." United States v. Clapp, 46 F.3d 795, 803 (8th Cir. 1995).

Although in his final pleadings Arnold clearly alleges a violation of the Eighth Amendment's prohibition against "cruel and unusual punishment," and he clearly alleges a conspiracy to murder him, the record is decidedly unclear as to whether this suit was tried as a failure-to-protect case or as an excessive-force case. The nature of the prisoner's Eighth Amendment claim dictates the state of mind in which the appellants must have acted in order to find them liable. For example, in a failure-to-protect case, the jury must find that the appellants were deliberately indifferent in failing to protect the prisoner plaintiff from harm. Farmer v. Brennan, 114 S. Ct. 1970, 1977 (1994). In an excessive force case, however, the relevant question is generally whether the prison officers applied (or in this case, attempted to apply) force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986). We have held that jury

12

instructions in excessive force cases must include both the "malicious" and the "sadistic" elements.  Howard, 21 F.3d at 872.

This case does not fit neatly into either of the above categories. It would indeed be a gross understatement to call an alleged conspiracy to murder someone a "failure to protect" that person.  Yet, although the alleged facts of this case actually describe an attempted use of excessive force by a prison official using an inmate as his agent, the case did not arise in a disciplinary context where "competing obligations" justify the heightened requirements set out in Whitley.  See Whitley, 320-21 (1986) (explaining the competing institutional concerns for safety of prison staff or other inmates necessitating the heightened standard); see also Wright v. Jones, 907 F.2d 848, 851 (8th Cir. 1990) (noting the Whitley standard is not applicable when the defendants have not identified a competing obligation justifying the heightened requirement).  Because we find in this record no allegations of competing obligations supporting the use of the heightened standard, and in fact the allegations in this case do not arise in a disciplinary context, we conclude that the deliberate indifference standard is appropriate for this case. Here, when prison officials are alleged to have conspired to murder an inmate for their own personal (as opposed to institutional or penological) purposes in order to cover up illicit activities by one of them, those allegations, if proved at trial, would suffice to show that the defendants were "deliberately indifferent" to the safety of the plaintiff.  Thus, under the facts as alleged and tried, the district court did not abuse its discretion in refusing to include the "malicious" and "sadistic" elements in the jury instructions.

13

We have considered the appellants' remaining arguments, and find them either mooted by the reversal and remand for a new trial or lacking in merit.  We also find the motion to supplement the record to be mooted by our reversal and remand.

**III.**

For the foregoing reasons, we reverse and remand for a new trial in accordance with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

14