United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-3077

_____

| | |
|---|---|
| ROBERT L. MADEL; FRANK J. BRENNAN, | * |
| | * |
| | * Appeal from the United States |
| Appellants, | * District Court for the |
| | * Western District of Missouri. |
| v. | * |
| | * |
| FCI MARKETING, INC., a Missouri Corporation, | * |
| | * |
| | * |
| Appellee. | * |

_____

Submitted: February 13, 1997

Filed:    July 7, 1997

_____

Before HANSEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
MELLOY,[1] District Judge.

_____

MELLOY, District Judge.

---

[1]The Honorable Michael J. Melloy, Chief Judge, United States District Court for
the Northern District of Iowa, sitting by designation.

Appellants Robert Madel ("Madel") and Frank Brennan ("Brennan") appeal from the District Court's grant of summary judgment to Defendant FCI Marketing, Inc. ("FCI") in this employment discrimination case. We reverse and remand.

## I. Background

Both Plaintiffs were employed by FCI, a Missouri corporation that establishes independent distributorships nationwide for the sale of FCI-brand automobile parts. FCI operated by sending out "sales teams" whose responsibility it was to canvass a new distributor's area and solicit service station owners to accept delivery of a supply of FCI-brand parts on consignment and to physically place the first delivery of parts in the service stations (thereafter the distributor is responsible for such delivery and placement). Madel and Brennan were members of the same sales team.

Plaintiff Madel (age 55) was hired by FCI's national sales manager Allen Carlson ("Carlson") on September 7, 1994. During the interview, Carlson informed Madel "you old fuckers make good salesmen because most of the garage owners are old and you relate well together." Plaintiff Brennan (62) was hired by FCI president James Parker ("Parker") on September 10, 1994, on the recommendation of FCI sales representative Wayne Scholl ("Scholl").

The other FCI employees who worked with Plaintiffs on their sales team, and their ages, were: Dave Ruiter (59), Dale Finney (53), Dave Reynolds (47), Scholl (40), Clint Vigus (37), and Greg Sprinkles (31). Carlson (30) also worked with the team. Thus, Brennan was the oldest member and Madel was the third-oldest member of the sales team.

The first distributorship established by the sales team was based in Wheeling, West Virginia. The distributors' names were Brian and Kathy Hough. From September 11 to September 29, 1994, the team, led by Scholl, set up the

2

distributorship. From October 2, to October 18, 1994, the entire sales team, including Carlson, set up a distributorship in Knoxville, Tennessee for Eddie Edwards. On October 22, the entire sales team met in St. Joseph, Missouri for photographs for a magazine, and then left for Denver, Colorado to set up another distributorship. Plaintiffs were fired on October 28, 1994 while in Colorado.

Carlson recommended the termination of Plaintiffs, but the actual decision to terminate was made by Parker, president of FCI. Carlson and Parker maintain that the decision was based on several occurrences while the sales team was setting up distributorships and on their perception that Plaintiffs had bad attitudes.

The primary stated reasons for terminating Madel were the complaints about Madel's personal behavior while working with the Houghs. Kathy Hough complained that Madel had thrown fan belts wrapped in shrink wrap down the stairs in her home as the team was moving product into her basement. When asked to stop, Madel responded with a statement, the gist of which was "it does not matter what we do, we'll be out of here in a week anyway." When first introduced to Brian Hough, Madel refused to shake his hand. There is evidence that he also gave Hough a "dirty look." In addition, during daily meetings at the Houghs' and at other distributors' residences, Madel would remain in the driveway rather than join in the meetings or social gatherings.

Madel denies that he made any statement about leaving the Houghs' in a week, or that he refused to shake Brian Hough's hand. Madel does not, however, deny that he remained in the driveway during meetings. He explained that all sales team members sat out of the meetings at one time or another, and that during some of the meetings he was working with the product.

Madel's work performance was also criticized, as a significant number of accounts set up by Madel for the Houghs had to be "pulled" because the locations were

3

not appropriate for the sale of automotive parts. In addition, Madel placed fan belts at one repair shop so high on the wall that a car lift had to be used to reach them, which was in clear violation of the company policy of keeping all products within reach of customers.

While the Houghs did make these complaints about Madel, their primary displeasure with FCI was the lack of proper supervision and management of the sales team. Brian Hough stated that he only mentioned the incidents with Madel as examples of the lack of supervision of the team by Scholl.

The reasons cited for Brennan's termination centered on his refusal to accept responsibility. While in Knoxville, Brennan "creased" the door of a company van. Brennan did not immediately report the incident to Carlson, although he maintains he did inform his supervisor and an FCI representative from the "home office" of the accident. In another incident, a discrepancy between an order and the actual number of filters delivered to an account was discovered. When Carlson confronted the team about the discrepancy, Brennan denied responsibility with the rest of the group despite Carlson's warning that the responsible party would be fired if he did not speak up. Brennan alleges that he did admit during the meeting that he could have made the error, but that Carlson must not have heard his admission.

Parker and Carlson also felt, based on several incidents, that Plaintiffs had negative attitudes and were not "part of the team." According to Carlson, when the entire sales force met in St. Joseph, Missouri to have group pictures taken, Madel's body language prompted Parker to ask Carlson: "who's the guy with the bad attitude?" In addition, Plaintiffs did not travel with the sales team "convoy." For example, instead of attending a party with the rest of the sales team in Knoxville, Madel embarked for St. Joseph. Madel claims that he became separated from the rest of the group while on the way to the party, so he left early for Missouri. After the pictures were taken in St. Joseph, Madel and Brennan left for Denver without the rest of the sales team. Plaintiffs

4

claim they had permission to leave at any time, and when Carlson questioned them about their early departure, Plaintiffs explained that they did not like to drive as fast as the other members of the team. Finally, Carlson cited Madel's failure to join the rest of the group during meetings in distributors' homes as evidence of his failure to be a "team player."

Also cited as evidence of Plaintiffs' negative attitudes was their failure to arrive promptly at the evening team meetings while on the road. Plaintiffs were often, if not always, the last to arrive and Carlson frequently had to send someone to retrieve them for the meetings. In addition, as the two non-drinkers in the group, Plaintiffs often dined together without the rest of the team and did not join in any of the parties attended by the other team members.

Plaintiffs report that they were regularly subjected to discriminatory epithets such as "old fucker," "old fart," and "geriatric set" during their employment. The area in which they roomed was referred to as the "geriatric wing." The frequency with which these terms were used is in dispute, although Carlson does not deny making the epithets. Plaintiffs were also distressed during their employment due to their co-employees' and supervisor's drinking and carousing. Both employees witnessed parties in Carlson's hotel room, frequent alcohol consumption by FCI employees, and numerous trips to local bars. Neither Plaintiff condoned or participated in this behavior.

Four days before they were terminated, Plaintiffs met with Carlson. He discussed with them their negative attitudes and his perception that they were not "team players." He also discussed with them their early departure from St. Joseph without the other team members. Carlson did not discuss the complaints made by the Houghs, the damaged van, or the paperwork discrepancy. On October 28, 1994, Carlson again met with Plaintiffs and informed them of their termination. While Plaintiffs maintain

5

that they were not given reasons for their termination, the tape recording of the conversation made by Brennan reveals that Carlson did provide some explanation.

Plaintiffs brought suit against FCI alleging discriminatory discharge and harassment on the basis of age under the Age Discrimination in Employment Act("ADEA"), 29 U.S.C. §§ 621-634, and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010-213.095. The district court concluded that, while Plaintiffs could establish a prima facie case of discrimination, the record did not contain any indication that age was a factor in the decision to terminate them. The district court granted summary judgment and Plaintiffs appeal.

## II. DISCUSSION

We review the district court's grant of summary judgment <u>de novo</u>. <u>Smith v. City of Des Moines, Iowa</u>, 99 F.3d 1466,1468 (8th Cir. 1996). Summary judgment is proper only if the evidence taken in the light most favorable to the nonmoving party fails to create a genuine issue of material fact and one party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The ADEA makes it "unlawful for an employer. . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Persons age forty and over are protected by the ADEA. 29 U.S.C. § 631. A plaintiff can meet his burden of establishing intentional discrimination by presenting either direct or, more likely, indirect evidence of employment discrimination based on age. <u>Rothmeier v. Investment Advisors, Inc.</u>, 85 F.3d 1328, 1332-33 (8th Cir. 1996). In cases dealing with circumstantial evidence of discrimination, courts apply

the <u>McDonnell Douglas</u> burden shifting analysis.[2]  <u>See, e.g.,</u> <u>Holly v. Sanyo Mfg. Inc.</u>, 71 F.2d 1161, 1164 (8th Cir. 1985).

> Under the <u>McDonnell-Douglas</u> three step framework, the plaintiff has the initial burden of establishing a prima facie case [by showing that he was within the protected age group, that he met applicable job qualifications, that he was discharged, and that his position was filled by a younger individual].  If the plaintiff makes a prima facie showing, thus raising an inference of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge.  If the defendant meets this burden, the plaintiff must prove that the defendant's reason is merely a pretext for discrimination.

<u>Bashara v. Black Hills Corp.</u>, 26 F.3d 820, 823 (8th Cir. 1994) (citations omitted).  If the employer succeeds in carrying its burden of production, the plaintiff may avoid summary judgment only if he presents evidence that, in its entirety, "(1) creates a fact issue as to whether the employer's proffered reasons are pretextual and (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision."  <u>Rothmeier</u>, 85 F.3d at 1336-37.  This Court recently affirmed the importance of the latter requirement when it stated:

> . . . when the plaintiff's evidence of pretext challenges the defendant's articulated nondiscriminatory reason, such evidence may serve as well to support a reasonable inference that discrimination was a motivating reason for the employer's decision. . . . In sum, when the employer produces a nondiscriminatory reason for its actions, the prima facie case no longer creates a legal presumption of unlawful discrimination.  The

---

[2]Although the <u>McDonnell Douglas</u> test originated in the Title VII context, it applies with equal force to ADEA cases.  <u>See, e.g.,</u> <u>Bashara v. Black Hills Corp.</u>, 26 F.3d 820, 823 (8th Cir. 1994).  The Supreme Court has assumed, for now, that the test applies in the ADEA context.  <u>O'Connor v. Consolidated Coin Caterers Corp.</u>,-- U.S. --, 116 S.Ct. 1307, 1310 (1996).

<u>elements</u> of the prima facie case remain, however, and if they are accompanied by evidence of pretext and disbelief of the defendant's proffered explanation, they may permit the jury to find for the plaintiff. . . . We emphasize that evidence of pretext will not by itself be enough to make a submissible case if it is, standing alone, inconsistent with a reasonable inference of age discrimination.

<u>Ryther v. KARE 11</u>, 108 F.3d 832, 837(8th Cir. 1997) (en banc) (emphasis in original). The ultimate issue remains "whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of the plaintiff's age." <u>Rothmeier</u>, 85 F.3d at 1337; <u>see</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 511 n. 4 (1993) (plaintiff must show that proffered reason was false and discrimination was real reason for termination).

Despite Defendant's argument that Plaintiffs were not performing at a level that met FCI's expectations, the evidence, viewed in a light most favorable to Plaintiffs, establishes at least a factual issue as to Plaintiffs' prima facie case. To meet its burden of rebutting Plaintiffs' prima facie case, Defendant articulates numerous non-discriminatory reasons for terminating Plaintiffs. The justifications fall into three general categories--Plaintiffs' negative attitudes, distributor complaints about Madel's performance, and Brennan's lack of candor.

Despite the district court's finding that the record does not contain any indication that age was a factor in FCI's decision, Plaintiffs have presented evidence in response to Defendant's justifications from which a jury could conclude that age was a determinative factor in Defendant's decision to terminate them. We are primarily concerned with the allegedly pervasive use of age-based epithets by Carlson. While Defendant attempts to explain away these statements, arguing for example that they demonstrate that Defendant preferred to hire older employees, it is for the finder of fact to decide what was intended by the statements. See <u>Ryther</u>, 108 F.3d at 845 (where

8

different inferences can be drawn from undisputed facts, it is for the jury to determine which inference should be drawn) quoting Anglen v. Braniff Airways, 237 F.2d 736, 740 (8th Cir. 1956) (additional citations omitted).

Evidence of a corporate atmosphere hostile to older employees "can, if sufficient together with other evidence of pretext, support a reasonable inference of age discrimination." Ryther , 108 F.3d at 842 (co-employees' statements that plaintiff was "old fart", "old man" and "too old to be on the air", with other evidence, raised inference of discrimination) (emphasis in original).  Age-based comments such as Carlson's can constitute evidence of discriminatory intent.  See, e.g., Williams v. Valentec Kisco, Inc., 964 F.2d 723, 728 (8th Cir. 1992) (comment about "old man carrying the boxes" could be considered direct evidence of discriminatory intent, and provided an independent basis to support the jury's finding of pretext); Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991) (direct evidence of discrimination can include employer's remarks reflecting discriminatory attitude); Perry v. Kunz, 878 F.2d 1056, 1061 (8th Cir. 1989) (decisionmaker's comment to another employee that she chose plaintiff for termination because plaintiff would not retire was evidence of discrimination).  However, this Court has distinguished between "[c]omments which demonstrate a ‹discriminatory animus in the decisional process'" from "‹stray remarks in the workplace,' ‹statements by nondecisonmakers,' or ‹statements by decisionmakers unrelated to the decisional process.'"  Beshears, 930 F.2d at 1354, citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804-05 (1989) (O'Connor, J., concurring)). Statements about an "antiquated" book and a comment that the employer did not hire engineers over forty (made years before the plaintiff was terminated) were enough to create a factual issue regarding whether age was a factor in that plaintiff's termination.  Hardin v. Hussman Corp., 45 F.3d 262 (8th Cir. 1994). A reasonable person could infer from Carlson's age-based remarks that his recommendation to terminate Plaintiffs was based on age.

In addition, Plaintiffs have presented evidence to rebut Defendant's proffered reasons for the termination. For example, the complaints lodged by the Houghs primarily pertained to the entire sales team, rather than to Madel individually. While Kathy Hough objected to Madel's behavior, such as tossing fan belts down the stairs, she also noted that the entire sales team was inexperienced and unprofessional. Brian Hough specifically stated that any complaints he had were about the lack of supervision of the entire team, not the individual acts of Madel.

Plaintiffs were warned during a meeting four days before their termination that they needed to improve their attitudes and become "team players." They were also questioned about their decision to leave for Denver without the rest of the team. They were not, however, informed of the Houghs' complaints or about concerns regarding Brennan's dishonesty. Similarly, at the time they were terminated Carlson did not inform Plaintiffs of all the reasons now asserted for their termination, and he allegedly told Plaintiffs that he did not need to give them reasons. Again, viewing the evidence in a light most favorable to Plaintiffs, Carlson's repeated epithets, considered with the evidence presented to rebut Defendant's proffered reasons for firing Plaintiffs, creates a factual issue regarding the true motivation for the terminations.

Defendant cites to <u>Lowe v. J.B. Hunt Transport, Inc.</u>, wherein this Court held that the plaintiff who was hired by the same person who terminated him, who was employed for a short time, and who was in the protected age group at the time he was hired, failed to establish his claim of age discrimination. 963 F.2d 173, 175 (8th Cir. 1992). Recently, a similar conclusion was reached in <u>Grossmann v. Dillard Department Stores, Inc.</u>, in which this Court held that a jury could not reasonably infer that an employer who hired the plaintiff when he was forty-eight, fired him when he was fifty-two, and hired four operations managers over forty (two of them over fifty) the following year fired the plaintiff because of his age. 109 F.3d 457,459 (8th Cir. 1997). One important factual distinction prevents the Court from applying <u>Lowe</u> and <u>Grossmann</u> here--neither of the plaintiffs in those cases presented evidence of overt

10

discrimination. Thus, Carlson's derogatory comments in this case distinguish Plaintiffs' situation from those in <u>Lowe</u> and <u>Grossmann</u>.

Finally, all parties admit that the derogatory statements were made by Carlson and not by Parker, the final decision-maker. While statements made outside decision-makers' presence do not alone raise an inference of discrimination, they are not necessarily irrelevant. <u>Ryther</u>, 108 F.3d at 843 (citations omitted). In <u>Ryther</u>, the individuals responsible for the discriminatory comments frequently discussed the plaintiff's abilities with the decision-maker and she was responsive to the demand to take away some of the plaintiff's responsibilities. <u>Id.</u> The Court concluded that a jury could reasonably infer that the decisionmaker could have formed her impression of the plaintiff based on the discriminatory comments of his co-workers with whom she had contact and that she acted on her impressions by terminating the plaintiff. <u>Id.</u> Similarly, in this case Defendant admits that Carlson recommended that Parker fire Plaintiffs. A jury could conclude that Carlson was Parker's primary source of information regarding the activities of Madel and Brennan. Thus, despite the fact that Carlson may not have made the final decision to terminate Plaintiffs, his age-based statements are relevant to this analysis.

## III.  Conclusion

Plaintiffs have satisfied their burden of presenting sufficient evidence to create a genuine issue of fact as to whether FCI intentionally discriminated against Plaintiffs because of their age. Plaintiffs have created a fact issue as to whether FCI's proffered reasons are pretextual, and Carlson's age-based epithets create a reasonable inference that age was a determinative factor in the termination decision. Thus, the district court erred in granting FCI's motion for summary judgment.

Accordingly, we reverse the grant of summary judgment and remand for further proceedings consistent with this opinion.

A true copy.

Attest:

       CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.