# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 97-4373

Charles Theodore Denesha,

        Appellee,

     v.

Farmers Insurance Exchange,

        Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*

No. 97-4374

Appeals from the United States
District Court for the
Western District of Missouri.

Charles Theodore Denesha,

        Appellant,

     v.

Farmers Insurance Exchange,

        Appellee.

\*
\*
\*
\*
\*
\*
\*
\*
\*

Submitted:  September 24, 1998

Filed:  November 3, 1998

Before MCMILLIAN, HEANEY, and FAGG, Circuit Judges.

———————

HEANEY, Circuit Judge.

Charles Theodore Denesha brought this age discrimination suit against Farmers Insurance Exchange (Farmers), his former employer, pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. §§ 621-634 (West 1998), and the Missouri Human Rights Act (MHRA), Mo. Ann. Stat. § 213.055 (Vernon 1994). Farmers appeals from final judgments entered in the District Court for the Western District of Missouri. A jury awarded Denesha compensatory and liquidated damages under the ADEA and punitive damages under the MHRA. Upon post-trial motions the court granted Denesha further equitable relief in the form of attorneys fees and front pay and granted Farmers' motion for judgment as a matter of law with respect to punitive damages. Farmers appeals from denial of its motions for judgment as a matter of law or in the alternative a new trial on the issues of liability and willfulness under the ADEA, the award of front pay and liquidated damages, and the award of attorneys fees and costs. Denesha cross-appeals on the question of punitive damages and the amount of the front pay award. We affirm in part and reverse in part.

## I. BACKGROUND

"We recite the facts in the light most favorable to the jury verdict and the district court's findings." Newhouse v. McCormick & Co., Inc., 110 F.3d 635, 637 (8th Cir. 1997). In October of 1992, Charles Denesha was 55 years old and had been employed by Farmers as a Claims Representative (CR) for seventeen years. Denesha began his career with Farmers in 1975 as an Office Claims Representative ("OCR"), an entry-level office job handling small property claims over the telephone. In 1979, Denesha became a Field Claims Representative ("FCR") handling bodily-injury claims. In November of 1992, the Grandview Branch Claims Office ("BCO"), Denesha's place

2

of work from 1975, merged with the Kansas City BCO. Prior to the merger, Denesha had never been denied a raise[1] or formally disciplined.

In early December 1992, John White, the Branch Claims Manager for the Kansas City BCO, altered the salary review completed by Denesha's former supervisor, Julie Clark.[2] White went beyond the review period in question to find examples of poor quality work in order to justify denying a raise. Prior to the denial of the raise, Denesha had received no negative information regarding his performance. In both his November and December case reviews, however, Denesha's new supervisor, Joe Wilfong, had stated that the "younger employees [are] running circles around the older employees." (Tr. at 1216.) When Denesha complained about the salary decision, Wilfong and White treated him differently from other employees, failing to follow various office procedures. In addition, Denesha was not given leave-time to catch up on files as were other transferees from the Grandview BCO.

In October 1993, Denesha was demoted to an entry-level OCR position, which White had expressed an intention of discontinuing. Despite the demotion, Denesha maintained his FCR files in addition to the new OCR workload that White himself described as "horrendous." Additionally, Wilfong began recording complaints about Denesha without giving verbal warnings, though other employees received verbal warnings before any complaints became part of their permanent record. Notwithstanding White's and Wilfong's determination that Denesha's performance was inadequate, an audit by Farmers' regional office showed that Denesha was doing his

---

[1]From at least 1982, raises at Farmers were based on performance. During the seventeen-year period from 1975 to 1992, Denesha had received consistently positive evaluations under nine different supervisors.

[2]Though Joe Wilfong had replaced Clark as Denesha's direct supervisor after the merger, Clark prepared Denesha's 1992 salary review based on her day-to-day supervision of his work through October 1992 and recommended a 4% salary increase.

3

job. Purportedly due to consumer complaints, Farmers terminated Denesha's employment in May 1994.

Denesha then brought suit against Farmers, alleging that he was denied a raise and subsequently dismissed because of his age. Farmers contended that Denesha was denied a raise, demoted, and dismissed because of his poor performance. The jury found that Denesha's age was a determining factor in Farmers' decision to deny the raise and to fire him. Pursuant to special verdict forms, the jury determined that Farmers' violation of the ADEA was 'willful,' thereby supporting an award of liquidated damages, and that Farmers' conduct was 'outrageous,' thereby supporting an award of $4 million in punitive damages under the MHRA. The district court set aside the award of punitive damages and by final order awarded Denesha $102,614 in back pay with liquidated damages in the same amount, $61,666.67 in front pay, and attorneys fees in the amount of $149,906.97. Both parties appeal.

## II. DISCUSSION

### A. Jury Verdict on Denial of Raise and Subsequent Discharge

The first issue raised on appeal is whether the district court erred in denying Farmers' motion for judgment as a matter of law or, in the alternative, for a new trial on the claim that Denesha's denied raise and subsequent discharge were products of intentional age discrimination. Farmers contends that because Denesha's poor performance was well documented and because it treated him no differently than similarly situated employees, the district court committed clear error by sustaining the jury's verdict. Denesha, for his part, argues that even where the defendant offers a legitimate, nondiscriminatory reason in support of its actions, the plaintiff may prevail by presenting sufficient evidence for a jury to infer the ultimate fact of unlawful discrimination.

4

This court reviews de novo the denial of a motion for judgment as a matter of law, applying the same standard as the trial court.  See Cross v. Cleaver, 142 F.3d 1059, 1066 (8th Cir. 1998); Equal Employment Opportunity Comm'n v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998).  The standard of review for sufficiency of proof in an age discrimination suit embraces the fundamental issue of "whether [the plaintiff] produced sufficient evidence to allow a jury reasonably to find that [the employer] intentionally discriminated against him on the basis of his age."  Newhouse, 110 F.3d at 639 (quoting Ryther v. KARE 11, 108 F.3d 832, 835 (8th Cir.) (en banc), cert. denied, --- U.S. ---, 117 S. Ct. 2510 (1997) (alteration in original)).  "Appellate review of a jury verdict is extremely deferential."  Browning v. President Riverboat Casino, 139 F.3d 631, 634 (8th Cir. 1998).  We will not reverse a jury verdict for insufficient evidence unless "after viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable juror could have returned a verdict for the non-moving party."  Ryther, 108 F.3d at 836.  In reviewing a denial of a motion for judgment as a matter of law, we must (1) consider the evidence in the light most favorable to Denesha, (2) assume that all conflicts were resolved in favor of Denesha, (3) assume as proved all facts that Denesha's evidence tended to prove, (4) give Denesha the benefit of all favorable inferences that may reasonably be drawn from the proved facts, and (5) deny the motion unless all the evidence points one way and is susceptible of no reasonable inferences sustaining Denesha's position.  See Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796, 800 (8th Cir. 1994); Hicks v. Brown Group, Inc., 902 F.2d 630, 649 (8th Cir. 1990).  A motion for a new trial, by contrast, should only be granted if "the jury's verdict were against the great weight of the evidence so as to constitute a miscarriage of justice."  Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995).  We review the denial of a motion for a new trial for abuse of discretion.  See id.

The ADEA makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29

5

U.S.C. § 623(a)(1). Protection under the ADEA extends to persons age forty and older. 29 U.S.C. § 631. A plaintiff may meet his burden of establishing intentional age discrimination by relying on either direct or indirect evidence. See Beshears v. Asbill, 930 F.2d 1348, 1353 (8th Cir. 1991) (citation omitted). Analysis under the MHRA follows that of the ADEA. See Hanebrink v. Brown Shoe Co., 110 F.3d 644, 646 (8th Cir. 1997); McMullin v. McRaven, 882 S.W.2d 772, 774 (Mo. Ct. App. 1994).

Farmers strenuously argues that no reasonable jury could find "*both* that the [employer's proffered] reason [for the action taken against him] was false, *and* that discrimination was the real reason." Ryther, 198 F.3d at 838 n.5 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)) (emphases in original). Contrary to defendant's contentions, however, the fact that Farmers can offer legitimate reasons for plaintiff's denial of a salary increase and subsequent dismissal does not automatically entitle it to judgment as a matter of law. While Farmers offers a host of facially benign reasons for denial of the raise and the subsequent events leading up to and including Denesha's discharge, our review indicates that the record likewise amply supports the jury's conclusion that the offered reasons were merely a pretext for underlying age discrimination.

Substantial evidence in the record demonstrates that White and Wilfong did in fact judge Denesha's work by criteria different in both kind and quantum from that of other employees. In September 1992, in his last performance evaluation prior to the merger, Denesha received a rating of "very good." Clark, Denesha's supervisor at the time, recommended him for a program in which FCRs with a demonstrated ability to work without supervision were permitted to operate out of their homes. Clark also recommended a 4% salary increase based on her day-to-day supervision of his work through October of 1992. On December 4, 1992, at a time when Clark was out of the office on vacation, John White altered the performance review completed by Clark and

6

signed both his and Clark's name to the document.[3]  While Clark's portion of the evaluation had presented a complimentary picture of Denesha's achievements during 1992, White noted deficiencies in his performance[4] and wrote that "[y]ou need considerable improvement to assist the BCO in meeting it's [sic] service and cost goals." (Pl.'s Ex. 5.)  White testified that he assumed Clark would meet with Denesha to explain the performance review, despite the fact that he had not informed her of nor explained the basis for the alterations made to her evaluation.  Clark only became aware of the alteration when she received a letter from Denesha.  Only Denesha and one other employee, also over fifty years of age, at the Kansas City BCO were denied raises in 1992.

When questioned in a deposition as to the negative information added to Clark's performance review, White could not identify the source of the complaints.  At trial he contended that he, along with other managers, had received complaints about Denesha.  However, none of the managers allegedly receiving complaints about Denesha documented them, and Farmers was unable to produce alternative sources of documentation.  Neither Wilfong nor Clark, his direct supervisors during 1992, documented any complaints about Denesha prior to the December salary review.  Subsequently, White admitted that there was no documentation to support his allegation of complaints.

---

[3]The review form completed by Clark requires the signature of both a supervisor and a manager.  The purpose of obtaining a manager's signature on the review form is to indicate agreement with the supervisor's appraisal.

[4]Evidence presented at trial indicates that White also failed to follow company procedure in compiling the negative information.  He reviewed files in which the initial work was performed outside the period under immediate review, including one that dated to 1988.  Additionally, he did not follow accepted company practices in tabulating the timeliness of Denesha's client contact and in failing to treat contact with a client's attorney, the leaving of business cards at a home address, or contact made by an OCR as full contact.

Prior to being denied a salary increase, Denesha had no indication that his new supervisors were dissatisfied with his work. During his November case review with his new direct supervisor, Joe Wilfong, Denesha was not informed of any complaints. Wilfong did tell Denesha, however, that "younger employees [are] running circles around older employees." (Tr. at 1216.) Wilfong repeated this view during Denesha's December 1992 case review and to another FCR, Vyck Shanes. When Wilfong later told White that "he had used a poor choice of words," White suggested that in the future he use the term "newer" employees instead of "younger." (Tr. at 797-99.) At a meeting in the spring of 1993, White stated that the only way to improve things would be to get rid of the "old heads" around the office.

Other evidence also suggested that White and Wilfong treated Denesha in a disparate manner. For example, Denesha was placed on progressive discipline in June 1993 even though his performance was comparable to that of other FCRs[5] and despite the fact that he led the office in reduction of bodily injury ("BI") costs. Additionally, Denesha received more assignments than other FCRs. Both White and Wilfong refused to review records Denesha had compiled that showed his caseload to be significantly higher than other FCRs.[6] White dismissed these complaints as "bogus" and the product

---

[5]An evaluation of the Kansas City BCO performed on March 22, 1993, indicated that the caseload for the FCRs in that office was unmanageable. The report recommended a "[d]rastic[] reduc[tion in] the case load of the field CRs to a manageable level." While the report did not indicate that any FCR was further behind than any other in processing claims, evidence indicates that Denesha was assigned a substantially greater number of claims in the first five months of 1993 than any of his colleagues.

[6]Denesha's caseload difficulties were exacerbated by procedures at the Kansas City BCO pertaining to status reports. The Grandview BCO had operated under a special program in which FCRs were not required to turn in 90-day status reports on their files. Other employees who transferred from the Grandview BCO were taken off assignments so that they could catch up with their status reports. While FCRs Shanes and Moody were given from an additional ten months to a year to catch up on their

of a "chronic complainer." When Wilfong began recording complaints in January 1993, he told Denesha that he was recording complaints received about all employees and that he should not let it bother him. The younger CRs testified, however, that they received verbal warnings before their supervisors recorded complaints made against them. Wilfong also failed to do a field "ride along" with Denesha during the eleven months that he supervised him. The "ride along" is intended to improve the efficiency of CRs, and it is company policy to do a minimum of one per quarter, more if the CR is having problems. White admitted that he would be "shocked" to learn that a supervisor failed to do the "ride along." Wilfong did ride along with other employees and testified at trial that he consciously decided not to follow procedures with Denesha because he did not think it would help him.

After placing Denesha on formal discipline, Wilfong created goals for Denesha that were unattainable as measured by the accomplishments of other employees. Both White and Terry Lee, Farmers' Regional Liability Claims Manager, testified that it would be unreasonable to expect an FCR to settle more than 100 BI units in a month. In August 1994 White wrote to FCR Shanes to congratulate him on settling 158 BI units in a six-month period, and White testified that during the summer of 1993 anything more than thirty units in a month would have been satisfactory. Nonetheless, Denesha would have had to complete over 100 units in July 1993 to achieve the goal Wilfong set for him. This goal was in addition to catching up on all his status reports, a requirement that other CRs were given extra time to achieve .

At a September 1993 meeting, Wilfong told Denesha that his probationary period would end on October 7 and that his performance would be reviewed at that time. During September, Denesha settled the most bodily injury units in the Kansas City

---

status reports, Wilfong demanded that Denesha bring his up to current by June 14, 1993. Both Moody and Shanes testified on direct that Denesha was treated differently with respect to the status reports.

9

BCO. Nonetheless, he was demoted on October 7, 1993 to an entry level OCR position. White indicated that he did not respect the OCR position and that he did not intend to continue it. In addition to handling property damage claims and subrogation files as an OCR, Denesha continued to handle most of his remaining bodily injury files. On November 15, 1993, the subrogation and bodily injury files were taken away from Denesha, and on November 24, 1993, he again was placed on formal discipline. White characterized the workload at the Kansas City BCO during this entire time period as "horrendous." Nonetheless, a regional auditor observed in March of 1994 that Denesha had made 24-hour contact with claimants 100% of the time. This finding conflicted with the claims of White and Wilfong, who characterized Denesha as consistently below the required 90% goal for 24-hour contact. These facts support the jury's conclusion that Farmers' actions were the product of discriminatory animus with respect to Denesha's age.

Farmers next argues that regardless of what happened during Denesha's tenure as an FCR, the company cannot be held liable for discharging Denesha based on his work performance as an OCR. Farmers would have us treat each alleged discriminatory act as an isolated event to be kept distinct from each other unlawful act. Such an argument finds no support in our precedent. The district court correctly stated that a jury in assessing whether an employer's proffered reasons for the adverse employment action constitute pretext and whether there was intentional discrimination may consider the employer's conduct throughout the employee's tenure with the company. See Denesha, 976 F. Supp. at 1285 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973)); see also Hindman v. Transkrit Corp., 145 F.3d 986, 993 n.26 (8th Cir. 1998) (three-year-old statements, even if not themselves actionable, may be relevant as background evidence in proving ultimate issue of age discrimination); Hardin v. Hussman Corp., 45 F.3d 262, 266 (8th Cir. 1995) (statements remote in time can be used to meet "additional showing" requirement); Clements v. General Accident Ins. Co., 821 F.2d 489, 492 (8th Cir. 1987) (statements remote in time relevant to showing of general intent or inclination to discriminate).

Farmers' argument that Denesha could not create an inference of discrimination by raising issues stemming from his work as an FCR confuses relevance with direct causation. See Neufeld v. Searle Lab., 884 F.2d 335, 340 (8th Cir. 1989).

Here, however, Denesha was not limited to using the statements as background evidence. It is well settled that a plaintiff can meet his burden of proving intentional discrimination by providing evidence of remarks by decision makers reflecting a discriminatory attitude. See White v. Honeywell, 141 F.3d 1270, 1275-76 (8th Cir. 1998); Madel v. FCI Marketing, Inc., 116 F.3d 1247, 1252 (8th Cir. 1997); Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991). While it is true that prior evaluations establishing competent performance "do not render more recent negative evaluations inherently untrustworthy," Rose-Maston v. NME Hospitals, Inc., 1998 WL 11051, at *4 (8th Cir. 1998), direct evidence of discriminatory animus on the part of decision makers is relevant not only to the issue of pretext but may itself form the basis for a finding of intentional discrimination. See Madel v. FCI Marketing, Inc., 116 F.3d 1247, 1252 (8th Cir. 1997) (use of age-based epithets by sales manager sufficient to constitute evidence of discriminatory intent); Williams v. Valentec Kisco, Inc., 964 F.2d 723, 728 (8th Cir. 1992) (comment of shop foreman asking supervisor why he had an "old man carrying the boxes" constitutes direct evidence in support of jury's finding of pretext).

Both Wilfong's statements that the "younger employees were running circles around the older employees" and White's assertions that the office needed to rid itself of "old heads" occurred contemporaneously with events that form the basis of this litigation. Wilfong made his statements on several occasions near the time that Farmers denied Denesha's raise in December 1992. White made his statements in June 1993, at approximately the same time that plaintiff was placed on formal warning after White characterized him as a "chronic complainer" due to his attempts to receive a workload comparable to other employees. "As the Supreme Court has noted, '[i]t is the very essence of age discrimination for an older employee to be fired because the employer

11

believes that productivity and competence decline with old age.'" Parrish v. Immanuel Med. Ctr., 92 F.3d 727, 733-34 (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)). A reasonable jury could conclude from these facts that White and Wilfong's decisions regarding Denesha were informed by a discriminatory animus and that their workload and disciplinary decisions concerning Denesha were designed to elicit failure.

Similarly, Farmers' effort to characterize the comments of White and Wilfong as "stray remarks," "statements by nondecisionmakers," or "statements by decision makers unrelated to the decisional process" lacks persuasive force. See Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring); see also Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991) (adopting O'Connor's distinction between comments that demonstrate a discriminatory animus and stray or nondecisional remarks). Because Wilfong's and White's remarks concerning the performance of older employees were made during the same period as their decisions impacting Denesha's workload and job security, "[a] reasonable person could infer . . . that [the ultimate decision] to terminate [p]laintiff[] was based on age." Madel, 116 F.3d at 1252.

Farmers next argues that the record lacks substantial evidence establishing that its reasons for denying Denesha's 1992 raise rose to the level of intentional age discrimination. We disagree. To make his prima facie case, Denesha was required to show that he was a member of a protected group, he qualified for the raise, despite qualifying he was denied the raise, and other employees of similar qualifications who were not members of the protected group in fact received raises. See Winbush v. State of Iowa, 66 F.3d 1471, 1479 n.13 (8th Cir. 1995). Denesha was over forty, his supervisor submitted a highly complimentary review that was later altered by his manager on the basis of irrelevant and perhaps contrived information, he was denied the raise, and all other employee except one other individual over the age of fifty received raises. This showing, coupled with direct evidence of White's discriminatory

bias, amply supported the jury's determination that the denial of Denesha's 1992 raise was due to intentional age discrimination. See id. at 1479.

B. Damages

The court awarded Denesha $416,801.64 in overall damages, comprised of $102,614 each in compensatory and liquidated damages, $61,666.67 in front pay, and $149,906.97 in attorneys fees and expenses. Farmers challenges the award of attorneys fees and front pay.[7] Denesha on cross-appeal challenges the district court's calculation of front pay and revocation of punitive damages.

1. Award of Attorneys Fees

Due to its unique understanding of and exposure to proceedings before it, the district court retains discretion in determining attorneys fees. See Delph v. Dr. Pepper Bottling Co., 130 F.3d 349, 358 (8th Cir. 1997). The district court awarded plaintiff's lead trial attorneys $170 per hour in fees. Farmers complains that this is an unreasonable award as it is considerably higher than the rate charged by Farmers' own counsel. The record indicates, however, that the charges are consistent with rates in the Kansas City market, and that the fees charged by Farmers' attorneys are below market rate. See Denesha, 976 F. Supp. at 1290-91; see also Roche v. City of Normandy, 566 F. Supp. 37, 41 (E.D. Mo. 1983) (customary hourly charge is one factor to be considered in calculating fees). The record also indicates that the district court carefully reviewed the statements and billings of Denesha's attorneys, even in one instance eliminating apparently unrelated charges. Given the care with which the court apparently considered the issue, we find no indication of abuse of discretion.

---

[7]Our determination supra to reinstate punitive damages obviates any need, at least on the facts of this case, of addressing liquidated damages. Cf. Nelson, 26 F.3d at 803 n.1.

2. Award of Front Pay

Farmers challenges the award of front pay. On cross-appeal, Denesha argues that the district court abused its discretion in reducing the award for front pay based on a finding of failure to mitigate damages. We affirm the district court.

Under the ADEA the district court must tailor its remedy to make the injured party whole. Brooks v. Woodline Motor Freight, Inc., 852 F.2d 1061, 1065 (8th Cir. 1988). Front pay is an equitable remedy that in limited circumstances may be awarded in lieu of reinstatement, as where there is such hostility between the parties that "a productive and amicable working relationship would be impossible."[8] Id. (quoting EEOC. v. Prudential Fed. Sav. & Loan Ass'n, 763 F.2d 1166, 1172 (10th Cir.); see also Williams v. Valentec Kisco, Inc., 964 F.2d 723, 730 (8th Cir. 1992). The amount of front pay is an equitable matter to be determined by the court. See Newhouse, 110 F.3d at 642-43. In calculating front pay, the court has "the discretion to consider all the circumstances involved in determining appropriate equitable relief." Curtis v. Electronics & Space Corp., 113 F.3d 1498, 1504 (8th Cir. 1997). We review for abuse of discretion. Id.

"A successful ADEA plaintiff must show that he or she attempted to mitigate damages or face a reduction in the damage award." Newhouse, 110 F.3d at 641. This duty requires that the plaintiff use reasonable diligence in finding suitable employment and not refuse a position substantially equivalent to the one at issue. See id. (citations omitted). The defendant bears the burden of showing that there were suitable positions

---

[8]The district court noted that plaintiff does not actively seek reinstatement and defendant does not "seriously suggest" that reinstatement would be appropriate. The court also found that given the level of animosity between the parties, reinstatement would not be an appropriate remedy. We agree with this determination.

14

and that the plaintiff failed to use reasonable care in seeking them. See Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1106 (8th Cir. 1996).

For a period of six months following plaintiff's dismissal in May 1994 he attempted without success to find a job in the insurance industry. After six months, Denesha determined that he needed to replace his lost income and obtained part-time employment demonstrating magic toys at a toy store and as a substitute teacher. Denesha did not apply for another job in the insurance industry until two weeks before the front-pay hearing in September 1997. Thus, over a period of thirty-three months, during which he was employed part-time, Denesha made only a single application for employment in his area of expertise. At the front-pay hearing, the district court found credible the expert evidence presented by Farmers that there were a number of different positions that Denesha could have tried to obtain.[9] While the requirement of mitigating damages "is not onerous and does not require success," Brooks v. Woodline Motor Freight, Inc., 852 F.2d 1061, 1065 (8th Cir. 1988), the duty does require that the plaintiff exercise reasonable diligence, see Newhouse, 110 F.3d at 641. We sympathize with the frustrations faced by a plaintiff in his late fifties seeking work at a level comparable to his previous position with defendant. We cannot conclude, however, that the district court abused its discretion by finding that Denesha failed to make an "honest, good faith effort" to minimize his damages by obtaining full-time employment. Brooks, 852 F.2d at 1065; see also Payne, 924 F.2d at 111. Though attempts to find work do not have to rise to the level of ambition exhibited by the plaintiff in Brooks, a plaintiff must make some sustained minimal attempt to obtain comparable employment. See 852 F.2d at 1065. Denesha failed to make such an attempt. We therefore agree with the district court that an amount equal to what

---

[9]While an unemployed litigant need not "go into another line of work, accept a demotion, or take a demeaning position," Ford Motor Co. v. EEOC, 458 U.S. 219, 231 (1982), he also may not abandon his efforts "in the face of his difficulties," Payne v. Security Sav. & Loan Ass'n F.A., 924 F.2d 109, 111 (7th Cir. 1991).

Denesha would have earned if he had made reasonable mitigation efforts was properly subtracted from his award.  See Cassino v. Reichold Chems., Inc., 817 F.2d 1338, 1345 (9th Cir. 1987).

### 3.  Punitive Damages

Denesha argues that the district court erred by granting Farmers' motion for judgment as a matter of law as to the jury's award under the MHRA of $4 million in punitive damages.  While we conclude that  $4 million constitutes an excessive award on these facts, we agree with Denesha that a reasonable juror could determine that Farmers' actions support punitive damages.

The district court can set aside the jury's verdict only if, upon viewing the evidence in a light most favorable to the prevailing party, it concludes that no reasonable juror could have returned a verdict in favor of the nonmoving party.  See Ricketts v. City of Columbia, 36 F.3d 775, 778 (8th Cir. 1994).  We apply the same standard that governed the district court.  See id.  In granting judgment as a matter of law in favor of Farmers, the district court noted that "[t]he issue of liability was extremely close-- another jury could have found that age was not the determining factor in defendant's decision to terminate plaintiff."  976 F. Supp. at 1288.  While both sides may have presented strong cases, the correct standard in reviewing a jury's verdict is to consider the evidence in the light most favorable to the plaintiff, see Ricketts, 36 F.3d at 778, not what might have been, see Ryther, 108 F.3d at 845 (quoting Forbes v. Arkansas Educ. Television Comm., 93 F.3d 497, 501 (8th Cir. 1996), rev'd on different grounds, 118 S. Ct. 1633 (1998)) ("We do not know what our answer would have been if we had been sitting on the jury, but that is not important.  There was conflicting evidence on this issue, and it could have gone either way.  Making decisions of this kind is exactly what juries are for.").  Considering the facts in a light most favorable

to Denesha, we cannot agree that no reasonable juror would be able to render a verdict for Denesha on the issue of punitive damages.[10]

Under Missouri law, "'[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others.'" Burnett v. Griffith, 769 S.W.2d 780, 789 (Mo. 1989) (en banc) (quoting Restatement (Second) of Torts § 908(2) (1979)). Unlike the willfulness standard for liquidated damages specified under the ADEA, see Hazen Paper Co. v. Biggins, 113 S. Ct. 1701, 1708-10 (1993), punitive damages issue under the MHRA only upon a finding of some element of outrage, see Burnett, 769 S.W.2d at 789. "The requisite level of recklessness or outrageousness can be inferred from management's participation in the discriminatory conduct." Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 575 (8th Cir. 1997).

The twin policy objectives of punitive damages are punishment and deterrence. See EEOC v. HBE Corp., 135 F.3d 543, 556 (8th Cir. 1998) (citing Call v. Heard, 925 S.W.2d 840, 848 (Mo. 1996) (citing Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 19 (1991))). The amount of punitive damages awarded under the MHRA should

---

[10]In addition, the cases relied upon by the district court in determining that punitive damages were inappropriate are not as factually analogous to the instant case as are other recent decisions. Neither Nelson v. Boatmen's Bancshares, Inc., 26 F.3d 796 (8th Cir. 1994), or Glover v. McDonnell Douglas Corp., 981 F.2d 388, 396 (8th Cir. 1992), involved any direct evidence of discrimination by key decision makers. By contrast, in Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 575-76 (8th Cir. 1997), the court upheld an award of punitive damages where a company ignored complaints and failed to follow policy in response to verbal sexual harassment. Similarly, in Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1062 (8th Cir. 1992), the court awarded punitive damages where a supervisor had disciplined a female employee more harshly than a male employee. See also Varner v. National Super Mkts., Inc., 94 F.3d 1209, 1214 (8th Cir. 1996) (denying punitive damage where no decision makers participated in the illegal conduct).

reflect this purpose of punishment and deterrence, taking into account additional factors such as the severity of the defendant's misconduct, the presence of aggravating or mitigating factors, and the financial situation of the defendant. See HBE Corp., 135 F.3d at 556 (citing Call, 925 S.W.2d at 848-49 (citing Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 19 (1991)). Considering the evidence in the light most favorable to Denesha, there was sufficient evidence of outrageousness to permit a reasonable juror to award punitive damages.[11] As in Kimzey, management participated directly in the discriminatory conduct. See 107 F.3d at 575. Wilfong, Denesha's direct supervisor, on several occasions stated that the work of older employees was inferior to younger employees. Though these statements were brought to the attention of White, the office manager, he failed to take the matter seriously, instead advising Wilfong to use different language in the future. In addition, Farmers failed to address EEOC complaints filed by Denesha in January 1993 following a meeting between himself and the head of the personnel department regarding the denial of a raise and again in May 1993 after White refused to examine statistics showing that his workload was unfair, despite an audit of the statistics used by Wilfong contradicting his perception of plaintiff's performance. There was also evidence to support a determination that White and Wilfong held older employees to different standards than younger employees. Deliberately restricting opportunities and rewards based on age is a violation of the law. It is precisely these type of attitudes and actions that punitive damages are designed to deter. In sum, the actions of White and Wilfong permit an inference of discriminatory animus on the part of key decision makers, thus establishing the quantum of outrageousness necessary to support an award of punitive damages. See Kimzey, 107 F.3d at 575.

Having concluded that punitive damages are appropriate, we turn to the question of whether the $4 million award exceeded what was fair and reasonable. Though the

---

[11]The parties do not contest the jury instructions as to the issue of punitive damages.

18

MHRA does not place a cap on damages, $4 million exceeds other awards upheld under Missouri law. See HBE Corp., 135 F.3d at 556-57. Missouri law provides for remittitur when a jury's punitive damages award exceeds what is fair and reasonable, see Mo. Ann. Stat. § 537.068(b) (West 1998), thus permitting the court to potentially obviate further consumption of judicial resources by giving the plaintiff a choice between a new trial and an award, see Hetzel v. Prince William County, 118 S. Ct. 1210, 1211-12 (1998) (holding that the practice of granting remittitur without giving the plaintiff the option of a new trial 'cannot be squared with the Seventh Amendment'). While there is no precise mathematical formula for determining punitive damages, see Finley v. Empiregas, Inc., 975 F.2d 467, 472 (8th Cir. 1992); Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 18 (1991), considerations of due process, relation to prior awards under Missouri law, and the nature and extent of the plaintiff's injuries convince us that remittitur in the amount of $700,000 more properly vindicates the policy objectives at issue. See Call, 925 S.W.2d at 848-49 (stating that a non-exhaustive list of considerations in assessing award of punitive damages includes severity of misconduct, aggravating or mitigating circumstances, and finances of the defendant); Moore v. Missouri-Nebraska Express, Inc., 892 S.W.2d 696, 713-14 (Mo. App. W.D. 1994) (applying same factors in determining proper amount of remittitur).

As an initial matter, the 24:1 ratio of punitive to compensatory damages is not unsettling as a matter of due process. See BMW of North America, Inc. v. Gore, 517 U.S. 559, 581-86 (1996) (striking a 500:1 punitive damages award as violative of the Due Process Clause of the Fourteenth Amendment). Cf. id. at 581-82 (citing Haslip, which described a 4:1 punitive to compensatory ratio as close to the line, but emphatically rejecting any categorical approach); Kimzey, 107 F.3d 577-78 (reducing punitive damages from a 100:1 to a 10:1 punitive to compensatory ratio). Similarly, the ratio of punitive damages to net worth is not unduly low when calculated according to Farmers' surplus. See HBE Corp, 135 F.3d at 556 (describing a punitive award of five percent of the corporation's net worth as "very high"). Farmers' surplus--the insurance industry equivalent to net worth--was $1.64 billion at the time of trial. However, state

regulations require the company to retain a minimum surplus of $1.5 billion. Denesha concedes that when characterizing the remaining $140 million in "excess surplus" as "net worth," which would yield a punitive damages award equal to 3 ½ percent of net worth upon the jury's award, may result in an excessive award under the approach taken in HBE Corp. In order to avoid the question of whether this constitutes an unreasonable award, Denesha would have us reduce the award to an amount equal to one-half of one percent of Farmers' net worth, understood in terms of excess surplus. While we follow the Supreme Court in rejecting this or any other categorical approach to determining punitive damages, see BMW, 571 U.S. at 581-82, we agree that $700,000--the product of this calculus--represents an appropriate award under the circumstances.

Consideration of "the nature and extent of the misconduct, [and] the impact on the individual plaintiff[]," reinforces our conviction that a $4 million verdict is excessive. See HBE Corp., 135 F.3d at 556. Farmers' management altered Denesha's salary review, relying on undocumented and uncorroborated complaints to justify denial of a raise and contemporaneously expressed the opinion that the performance of older workers was inferior. Subsequently, the same management also ignored EEOC complaints and treated Denesha in a manner different from that enjoyed by younger employees. While reiterating that the goal of punitive damages is to punish Farmers and create a disincentive against recidivism, we conclude that the nature and extent of the conduct does not support the jury's award. Keeping sight of those same objectives, we also conclude that the effect on Denesha does not warrant an award of $4 million. Though the record indicates an expected strong emotional response on Denesha's part to being denied a raise and ultimately fired, the harm suffered by plaintiff is more than adequately offset by the combined awards of compensatory and remitted punitive damages. Finally, remittitur in the amount of $700,000 also brings the award in line with our prior decisions. See Kientzy, 990 F.2d at 1062 ($400,000 award affirmed); HBE Corp., 135 F.3d at 557 (reducing award from $4.8 million to $480,000).

Accordingly, we vacate the district court's order on punitive damages and remand for a new trial on that issue only unless Denesha agrees to an award of $700,000.

C. "Willfulness" of ADEA Violation

Farmers contends that the district court committed clear error by sustaining the jury's finding that Farmers violation of the ADEA was "willful." The district court concluded on this basis that plaintiff was entitled to $102,614 in liquidated damages. See 29 U.S.C. § 626(b) (providing for liquidated damages in an amount equal to the compensatory damages awarded by the jury). Denesha apparently conceded before the district court that punitive damages under the MHRA and liquidated damages under the ADEA are mutually exclusive, while arguing that he was entitled to the greater of the two amounts. See Denesha, 976 F. Supp. at 1287. Given our decision to reinstate punitive damages with remittitur of $700,000--an amount larger than the liquidated damages award--we need not reach the issue of whether defendant's violation was "willful." Cf. Nelson, 26 F.3d at 803 n.1

D. Farmers' Motion for a New Trial

Farmers also argues that a new trial is warranted because of error in the jury instructions and in order to prevent a miscarriage of justice. We review the denial of a motion for a new trial for abuse of discretion. See Nelson, 26 F.3d at 800. We have considered Farmers' arguments and find no abuse of discretion by the district court. Therefore, the denial of Farmers' motion for a new trial is affirmed.

E. Remaining Issues

We have carefully reviewed the remaining issues raised by the parties and conclude that they are without merit.

## III.

For the reasons stated above, we affirm the district court's order denying Farmers' motion for judgment as a matter of law or a new trial and affirm the district court's award of $102,614 in compensatory damages and $61,666.67 in front pay. We also affirm the district court's order with respect to attorneys fees and costs, except insofar as such award fails to reflect Denesha's fees and costs incurred in post-trial arguments on the issue of punitive damages. We reverse, however, the district court's decision to set aside punitive damages, and remand to the district court with instructions to submit to Denesha remittitur in the amount of $700,000, with the option of a new trial on the issue of punitive damages only, and for further proceedings not inconsistent with this opinion, including recalculation of attorneys fees and costs in light of this decision.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.