Pamela WEYERS, Plaintiff,

v.

**LEAR OPERATIONS CORPORATION,**
d/b/a Lear Corporation, Defendant.

No. 00–0877–CV–W–5.

United States District Court,
W.D. Missouri,
Western Division.

Aug. 14, 2002.

## ORDER

LAUGHREY, District Judge.

Pending before the Court is Defendant Lear Operations Corporation, d/b/a Lear Corporation's ("Lear") Motion for Judgment as a Matter of Law or in the Alternative for New Trial [Doc. 72]. On October 24, 2001, a seven-member jury returned a verdict finding that Plaintiff Pamela Weyers ("Weyers") was terminated by Lear because of her age. The jury also found that Weyers had been subject to age harassment in the workplace by Lear. On Weyers' age harassment claim, the jury awarded $125,000 in actual damages and $500,000 in punitive damages. The award of punitive damages was made pursuant to the Missouri Human Rights Act. On her age discrimination claim based on Weyers' termination, the jury awarded $68,962 in actual damages and $125,000 in punitive damages. The award of punitive damages was again made pursuant to the MHRA. In addition, on both Weyers' age discrimination claim and her age harassment claim, the jury found Lear's conduct to be willful pursuant to the Age Discrimination in Employment Act (ADEA). For the reasons stated below, Lear's Motion for Judgment as a Matter of Law or in the Alternative for New Trial is denied. Weyers, however, must choose between a new trial or remittitur in the amount of $293,962.

### I. Legal Standard—Judgment as a Matter of Law

In determining whether a motion for a judgment as a matter of law should be granted, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In *Reeves,* the Supreme Court explained that

> although the court should review the records as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe .... That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'

*Id.* at 151, 120 S.Ct. 2097. Judgment as a matter of law is appropriate only when all the evidence points one way and is susceptible of no reasonable inference sustaining the jury's verdict. *Scott Fetzer Co. v. Williamson,* 101 F.3d 549, 553 (8th Cir.1996).

### II. Discussion—Lear's Motion for Judgment as a Matter of Law

#### A. Weyers' Age Discrimination Claim—Termination

Lear argues first that it is entitled to judgment as a matter of law on Weyers' claim that she was discharged because of her age. Lear contends that there was no

evidence presented at trial demonstrating that any decision-maker discriminated against Weyers on the basis of her age. Lear asserts that in order to prove a discriminatory discharge claim, a plaintiff must provide evidence of discriminatory animus on the part of decision-makers. [*See* Dft's Sugg. at 3]. Lear asserts there was no evidence at trial to support the proposition that the individual who made the decision to terminate Weyers' employment-Tony Mendez ("Mendez")-did so on the basis of Weyers' age. It argues that the only evidence presented concerned the conduct of Ben Brosius ("Brosius") and that there is no evidence he was involved in Weyers' termination aside from mere speculation.

It is true that "a plaintiff can meet [her] burden of proving intentional discrimination by providing evidence of remarks by decision makers reflecting a discriminatory attitude." *Denesha · v. Farmers Ins. Exchange,* 161 F.3d 491, 500 (8th Cir.1998) (citations omitted). Weyers does not direct the Court's attention to any direct remarks by Mendez demonstrating that Mendez had a discriminatory attitude. The Court does not believe, however, that Weyers' claim is therefore precluded. "A plaintiff can meet [her] burden of establishing intentional discrimination by presenting either direct or, more likely, indirect evidence of employment discrimination based on age." *Madel v. FCI Marketing, Inc.,* 116 F.3d 1247, 1251 (8th Cir.1997) (citation omitted). In this case, the Court believes that Weyers produced indirect evidence which could allow a jury to find that she was terminated because of her age.

First, as Weyers points out, there was evidence that three out of four individuals who were terminated during Weyers' tenure with Lear were over the age of forty, but that only seventeen percent of Lear's workforce during that time was over the age of forty. [Tr. at 254–55, 383]. In addition, while Lear contends that Mendez was solely responsible for the decision to terminate Weyers, there was evidence to the contrary, along with evidence that Mendez's ·decision may have been influenced by Brosius. For instance, Weyers presented evidence that Brosius completed several of Weyers' performance evaluations. [Tr. at 89–90]. Further, Mendez's testimony suggested that his decision to terminate Weyers was based in part on the evaluations completed by Brosius. [Tr. at 94].

In *Madel,* the plaintiff sued his former employer for discriminatory discharge and harassment in violation of the Age Discrimination in Employment Act ("ADEA"). The facts demonstrated that Allen Carlson ("Carlson") recommended the plaintiff's termination, but that the decision to terminate was actually made by James Parker ("Parker"). *Madel,* 116 F.3d at 1249. In considering the plaintiff's claims, the Eighth Circuit noted the parties' agreement that all derogatory statements at issue were made by Carlson and not by Parker. *Id.* at 1253. The court then stated that "[w]hile statements made outside decision-makers' presence do not alone raise an inference of discrimination, they are not necessarily irrelevant." *Id.* (citing *Ryther v. KARE 11,* 108 F.3d 832, 843 (8th Cir.1997) (en banc)). After briefly discussing the decision in *Ryther,* the court in *Madel* concluded that a jury could conclude that Carlson was Parker's primary source of information regarding the plaintiff and that, despite Carlson's lack of involvement in the termination decision, his age-based statements were relevant to the analysis. *Id.*

Similar to *Madel,* the Court believes that the jury could have believed Brosius to be Mendez's primary source of information regarding Weyers. As noted, there

was evidence that Mendez's decision to terminate Weyers was based in part on Brosius' evaluations of Weyers' performance. There was evidence from more than one witness that Brosius made age-based statements, suggesting that he possessed a discriminatory attitude. It is undisputed that Brosius was Weyers' team leader for part of her employment and there was evidence that Brosius had a significant amount of contact with Weyers. In contrast, there was evidence that Mendez was less involved in supervising Weyers' training and activities. [Tr. at 81]. In addition, Weyers testified that she complained to Bill Courteville ("Courteville") and Mendez that she was being harassed and treated differently because of her age [Tr. at 293–95], but that Mendez did not take her complaints seriously. [Tr. at 295].

There was also evidence at trial that Mendez was not the sole decision-maker on Weyers' termination. In addition to Brosius' evaluations of Weyers, there was evidence that Courteville was involved in Weyers' termination. Courteville, the night shift supervisor at Lear, testified that Mendez made the ultimate decision to fire Weyers. [Tr. at 447]. Courteville, however, was present with Mendez at the meeting held with Weyers wherein Weyers' employment was terminated. [Tr. 442–43]. Courteville also testified that he gave "[a] lot" of weight to Brosius' evaluations of Weyers. [Tr. at 437]. He indicated that was because Brosius observed Weyers' performance and was with her all of the time. [Tr. at 437]. Moreover, there was testimony from Mark Lamar ("Lamar") that he overheard Courteville refer to another Lear employee as "overweight and too old ... [t]o do the job." [Tr. at 137–38]. Such a comment reasonably suggests that Courteville had a discriminatory attitude toward older employees.

In addition, the Court believes that the jury could reasonably conclude that Lear's asserted reason for Weyers' termination was false. Lear claims that Weyers was terminated due to poor performance. In support of this position, there was testimony from Mendez that he personally observed and evaluated Weyers' job performance. [Tr. at 94:15–22]. Mendez stated that he terminated Weyers for "poor performance." [Tr. at 94:5]. Despite this assertion, there was evidence that Mendez never took any formal disciplinary action against Weyers prior to terminating her employment. [Tr. at 82:9–11]. Furthermore, there was testimony from some of Weyers' co-workers indicating that Weyers' job performance was satisfactory or even "real good" and that she was not given the same training and assistance as younger employees. [See Tr. at 34:5–16; 67:7–24; 70:3–8; 134:3–25; 135:13—136:17; 168:4–20; 182:22—183:15; 197:19–21; and 207:13–24]. At least one co-worker testified that when Mendez was watching Weyers' work, she was doing a good job. [Tr. 57–58]. Viewing the evidence in the light most favorable to the Plaintiff, the jury might well have believed that Mendez was not telling the truth. Indeed, his testimony surrounding Weyers' evaluations is open to question. [Tr. 85–91]. [Also see Tr. 508–18, testimony of Jeff Sitz concerning the evaluations.] The Supreme Court in Reeves stated that "[p]roof that the defendant's explanation is unworthy of credence is ... one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." 530 U.S. at 147, 120 S.Ct. 2097 (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 517, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). Based

upon the evidence viewed in the light most favorable to Weyers, a jury could reasonably have concluded that Lear's asserted reason for Weyers' termination was unworthy of credence. That conclusion then further supports the ultimate finding of discrimination.

■ In sum, the Court believes there was sufficient evidence for a reasonable jury to conclude that Weyers was the victim of age discrimination in connection with her discharge. It is only "'[w]hen the record contains no proof beyond speculation to support the verdict, [that] judgment as a matter of law is appropriate.'" *Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir.2001) (citation omitted). Based upon the evidence in this case, and drawing all reasonable inferences in favor of Weyers, the Court does not believe that Lear is entitled to judgment as a matter of law on Weyers' claim of discriminatory discharge; the Court therefore will not disturb the jury's verdict as to liability on this claim.

**B. Liquidated and Punitive Damages on Weyers' Claim of Discriminatory Discharge**

Lear argues in the alternative that, should the Court uphold the verdict on Weyers' claim of discriminatory discharge, any award of liquidated and/or punitive damages is improper and against the weight of the evidence. Lear initially states that it is impossible to determine exactly what portion of the jury's verdict is liquidated damages and what portion, if any, is punitive under the Missouri Human Rights Act ("MHRA"). [*See* Dft's Sugg. at 5].

■ On the verdict form, under Weyers' claim for age discrimination, the jury was asked whether Lear's conduct, as submitted in the age discrimination verdict director instruction, was "willful." The "willfulness" standard is used in determining whether an award of liquidated damages under the ADEA is appropriate. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (reaffirming that the *Thurston* definition of "willful" applies to all disparate treatment cases under the ADEA). The jury did not, however, actually enter an award of liquidated damages in this case. Liquidated damages under the ADEA are dictated by statute and are properly entered by the Court. *See Spencer v. Stuart Hall Co., Inc.*, 173 F.3d 1124, 1129 (8th Cir. 1999) (stating that an improperly dismissed employee is entitled to a double recovery, called liquidated damages, if he proves his employer willfully violated the ADEA and citing 29 U.S.C. § 626(b)), and *Hudson v. Normandy School Dist.*, 953 F.2d 410, 411 (8th Cir.1992) (noting that jury awarded plaintiff backpay of $33,000 and that the district court added another $33,000 based upon the finding of a "willful" violation). The Court has not yet entered an award for liquidated damages under the ADEA. Based upon the jury's "willfulness" finding, Weyers is entitled to liquidated damages in the amount of $68,- 962—the amount the jury awarded Weyers for back pay.[1] On the verdict form, the jury was separately asked to determine the amount of punitive damages, if any, on Weyers' MHRA claim. [*See* Instruction 20]. The jury awarded $125,000 in punitive damages on Weyers' claim of age discrimination. All of this award is for punitive damages under the MHRA.

■■ To qualify for an award of liquidated damages under the ADEA, Weyers

---

1. While the Court acknowledges that a finding of willfulness entitles Weyers to liquidated damages, it believes that the ADEA liquidated damages may be duplicative of the punitive damages award under the MHRA. Alternatively, the Court believes that remittitur of the ADEA liquidated damages is required. (See discussion under subsection V).

must show that Lear willfully violated the ADEA. *See Hazen,* 507 U.S. at 614, 113 S.Ct. 1701. A violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* at 617, 113 S.Ct. 1701. The Eighth Circuit has described the relevant inquiry as follows:

> To support an award of liquidated damages, ... the sole relevant determination is whether the evidence meets the standard that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." The question is not whether the evidence used to establish willfulness is different from and additional to the evidence used to establish a violation of the ADEA, but whether the evidence-additional or otherwise-satisfies the distinct standard used for establishing willfulness.

*Brown v. Stites Concrete, Inc.,* 994 F.2d 553, 560 (8th Cir.1993). Lear contends that there was no evidence introduced at trial that would support the jury's willfulness finding with respect to Weyers' discharge. The Court disagrees.

First, Lear did not have any policy against age discrimination. [Tr. at 390–92]. Only after the filing of this lawsuit did Lear post an anti-age discrimination policy. [Tr. at 390–92]. Second, Weyers complained to Mendez and Courteville about being discriminated against because of her age and no action was taken. [Tr. at 294–95]. Third, a jury could reasonably believe that the reason given by Mendez for firing Weyers was a pretext given the conflicting evidence about her job performance and problems with training.

Fourth, Courteville, who was present during Weyers' firing had himself spoken disparagingly about an employee's age. Fifth, there was evidence that older workers received less training than younger workers and less help in difficult situations than younger people in the Rear Seat Department, the same department in which Weyers was employed and the same department and shift for which Mendez was responsible. Given the totality of the circumstances, a reasonable jury could have believed that Mendez and others willfully discriminated against Weyers on the basis of her age.

Finally, there was evidence that Mendez was familiar with the ADEA and knew it was illegal to discriminate against individuals on the basis of age. [Tr. at 92]. The Court acknowledges that an employer's "knowledge of the ADEA is not the equivalent of [its] knowledge that its conduct violated the ADEA." *Gilkerson v. Toastmaster, Inc.,* 770 F.2d 133, 137 (8th Cir. 1985) (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 626, 83 L.Ed.2d 523 (1985)). The evidence in this case, however, demonstrated more than just Lear's knowledge of the ADEA. This Court cannot say as a matter of law that based upon the evidence in this case, no reasonable juror could have returned a verdict for Weyers on the issue of willfulness.

As noted, the jury also awarded Weyers $125,000, in punitive damages on her MHRA age discrimination claim. Lear points out that "District courts must undertake an independent review of the evidence to determine whether it supports punitive damages." *Gorman v. Easley,* 257 F.3d 738, 749 (8th Cir.2001) (citing *Grabinski v. Blue Springs Ford Sales, Inc.,* 203 F.3d 1024, 1025 (8th Cir.) (reversed on other grounds), *cert. denied,* 531 U.S. 825, 121 S.Ct. 70, 148 L.Ed.2d 35 (2000), and *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)).

Under Missouri law, in order for an award of punitive damages to sur-

vive, the evidence presented must satisfy the clear and convincing standard of proof. *See Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 111 (Mo.1996). Missouri requires that punitive damages may only be awarded for " 'conduct that is outrageous, because of defendant's evil motive or reckless indifference to the rights of others.' " *Denesha,* 161 F.3d at 503 (quoting *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo.1989) (en banc)) (quoting Restatement (Second) of Torts § 908(2) (1979)). "Unlike the willfulness standard for liquidated damages specified under the ADEA, punitive damages issue under the MHRA only upon a finding of some element of outrage." *Id.* (internal citations omitted).

Lear suggests that punitive damages may only be imposed upon a showing that upper management was directly involved in the discrimination at issue. It further contends that there is no such evidence in this case, as there was no testimony that Mendez made any age-based comments or treated Weyers in a discriminatory manner because of her age. Lear asserts that to the contrary, Brosius was the only individual who allegedly engaged in such behavior.

Lear's argument ignores the fact that the Court determined Brosius to be Weyers' direct supervisor during part of her employment with Lear.[2] In *Denesha,* the Eighth Circuit reversed the district court's decision to grant the defendant's motion for judgment as a matter of law on the jury's award of punitive damages. 161 F.3d at 502. In so doing, the court noted that the plaintiff's direct supervisor had stated on several occasions that "the work of older employees was inferior to that of younger employees." *Id.* at 503. Further, the court noted that although the statements were brought to the office manag-

er's attention, the office manager failed to take the matter seriously. *Id.* In addition, the court noted that there was evidence the plaintiff's direct supervisor and office manager "held older employees to different standards than younger employees." *Id.* at 504. The court then stated that "[d]eliberately restricting opportunities and rewards based on age is a violation of the law. It is precisely these types of attitudes and actions that punitive damages are designed to deter." *Id.*

Similar to *Denesha,* there was evidence in this case that Brosius made age-based discriminatory remarks. There was also evidence that Brosius, who controlled Weyers' work rotation for a period of time, did not give Weyers the full work rotation that younger employees were given. [Tr. at 40, 288]. There was also evidence that Weyers was not given the same training as younger employees. Moreover, viewing the evidence in the light most favorable to Weyers, there was evidence that Courteville and Mendez were aware of Brosius' ageist remarks, but did nothing in response. [Tr. at 293–95]. The evidence also suggested that even with the knowledge of Brosius' remarks, both Mendez and Courteville based their decision to terminate Weyers in part on Brosius' evaluations of Weyers' performance. On top of that, there was evidence that Brosius' evaluations may have been improperly entered on Weyers' Hire Plan Progress Report. Weyers testified that when she first saw the Hire Plan Progress Report in January of 2000, there were three previous evaluation dates which contained no evaluation information. These were, however, later filled in and initialed by Brosius. [Tr. at 298–302]. Further, as discussed above, there was evidence from which the jury

---

**2.** As will be discussed below, Lear contends that they are entitled to a new trial based

upon this ruling.

could conclude that Mendez's reason for terminating Weyers was pretext for age discrimination. The Court therefore believes there was sufficient evidence for the jury to infer management's direct participation in discriminatory conduct toward Weyers. There was also sufficient evidence to "permit an inference of discriminatory animus on the part of key decision makers, thus establishing the quantum of outrageousness necessary to support an award of punitive damages." *Id.* (citing *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 575 (8th Cir.1997)). *Also see McGuire v. Tarmac Environmental Co.*, 293 F.3d 437, 442 (8th Cir.2002).

■ Pursuant to *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 581–86, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court has also considered whether the award of $125,000 in punitive damages under the MHRA was constitutionally permissible. In making that evaluation, the Court has considered both the punitive damage award under the MHRA and the liquidated damages that were awarded pursuant to the ADEA. The ratio between Weyers' actual damages and her liquidated/punitive damages is approximately 3 to 1. Considering the impact on Weyers of her discriminatory termination, the degree of wrongdoing by Lear, and its ability to prevent the wrongdoing, and the ratio between actual damages and punitive damages (3 to 1), the Court finds that the jury award of $125,000, plus the ADEA liquidated damages of $68,962, is constitutionally permissible. This amount is consistent with *Denesha v. Farmers Insurance Exchange*, 161 F.3d 491 ($700,000 punitive damages for an age discrimination case); and *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041 (8th Cir.2002) (10 to 1 ratio was permissible).

## C. Weyers' Age Discrimination Claim—Harassment

■ Lear next argues that it is entitled to judgment as a matter of law on Weyers' claim of age harassment. Lear contends that there is insufficient evidence that Brosius harassed Weyers because of her age. It suggests that there was no evidence at trial of severe and pervasive conduct by Brosius or that Weyers was singled out because of her age. Lear further contends that there is insufficient evidence that Brosius even "harassed" Weyers. The Court disagrees.

■ In order to prevail on a hostile work environment claim, a plaintiff "must show that she was singled out because of her [age], and that the conduct was severe and pervasive." *Williams v. City of Kansas City, Missouri*, 223 F.3d 749, 753 (8th Cir.2000). Lear argues that Weyers was not singled out because Brosius, the harasser in this case, "bugged everybody," according to some witnesses. [Tr. at 210]. Lear further suggests that the conduct to which Weyers was subjected was not unlawful harassment. In making its argument, however, Lear ignores much of the evidence concerning Brosius' conduct toward Weyers. Weyers points out, for instance, that there was evidence that Brosius physically knocked her out of his way, threw screws at her and that he called her an "old bitch," a "dumb old bitch," and a "stupid old fucker." [Tr. at 134, 146, 200, 272–73, 279–80, 308–10, and 313–14]. In addition, Weyers points out that Brosius stated that he hated "that old bitch" and that Weyers would not be around much longer. [Tr. at 143, 163, 179–80, and 278]. Weyers testified to hearing Brosius state that if you were over 25 years of age and a female, you did not belong at Lear. [Tr. at 278]. Further, Weyers and her co-workers testified that Weyers was treated differently than younger employees by Brosi-

us both in terms of the training she was given and in terms of not being put on a normal work rotation. Even the young men hired at the same time as Weyers testified that she was not treated the same as they were or as other younger workers were. Finally, Weyers provided evidence at trial that Brosius made age-based remarks to other employees at Lear. [Tr. at 179–80, 164, 249, and 525]. Such evidence was relevant to whether Lear maintained a hostile work environment and whether Brosius intended to harass employees on the basis of age. *See, e.g., Madison v. IBP, Inc.,* 257 F.3d 780, 793 (8th Cir.2001) (reversed on other grounds).

▇▇▇▇ In sum, " '[t]here is no bright line between [age] harassment and merely unpleasant conduct so a jury's decision must generally stand unless there is trial error.' " *Williams,* 223 F.3d at 753 (citing *Hathaway v. Runyon,* 132 F.3d 1214, 1221 (8th Cir.1997), and *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir. 1998) ("Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury.")). After reviewing the evidence

and considering it in the light most favorable to Weyers, the Court is satisfied that there was enough evidence submitted at trial to support the jury's finding that Weyers suffered harassment based upon her age; the Court will therefore uphold the jury's verdict.[3]

### D. Liquidated and Punitive Damages on Weyers' Claim of Harassment

▇▇▇ Lear's final argument in support of its Motion for Judgment as a Matter of Law is that there is no basis for an award of liquidated or punitive damages on Weyers' claim of age harassment. The standards for obtaining such damages have been discussed in Part II.B. above. Applying those standards, the Court believes there was sufficient evidence for the jury to find that Brosius' conduct amounted to a willful violation of the ADEA, and that there is sufficient evidence to support an award of punitive damages.

First, as noted above, in order to be awarded liquidated damages, Weyers must show that Lear willfully violated the ADEA. *See Hazen,* 507 U.S. at 614, 113 S.Ct. 1701. A violation is willful if "the employer either knew or showed reckless

---

**3.** Lear argues, in a footnote, that the evidence submitted at trial was insufficient to support the award of emotional distress damages on Weyers' harassment claim. It contends this is the case because Weyers offered no medical testimony on this issue and only generally described her emotional distress. As the cases cited by Lear suggest, it is true that " '[a]n award of damages for emotional distress must be supported by competent evidence of "genuine injury." ' " *Bailey v. Runyon,* 220 F.3d 879, 880 (8th Cir.2000) (quoting *Forshee v. Waterloo Indus., Inc.,* 178 F.3d 527, 531 (8th Cir.1999) (quoting *Carey v. Piphus,* 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978))). However, as Weyers points out, she did not need to submit medical testimony to prove her emotional distress damages. *See id.* at 881 (citing *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1065 (8th Cir.1997)). Instead, "a plaintiff's own testi-

mony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard." *Id.* (citations and internal quotations omitted). In the instant case, there was evidence that Weyers suffered emotional distress as a result of Lear's conduct, including testimony that she could not sleep and that at one point, her depression caused her to pull her hair out. [Tr. at 325]. The Court will therefore not overrule the jury's award of damages for emotional distress. Furthermore, viewed historically, the amount of the emotional distress damages awarded is within the ballpark. *See Kim v. Nash Finch Co.,* 123 F.3d 1046, 1067 (8th Cir.1997) ($100,000); *Kientzy v. McDonnell Douglas Corp.,* 990 F.2d 1051, 1062 (8th Cir.1993) ($150,000); *Wilmington v. J.I. Case Co.,* 793 F.2d 909, 922 (8th Cir.1986) ($400,000).

disregard for the matter of whether its conduct was prohibited by the statute." *Id.* at 617, 113 S.Ct. 1701. In this case, Brosius was the individual alleged to have harassed Weyers. While there was no evidence that Brosius was familiar with the ADEA and its prohibitions against age discrimination, there was evidence that Weyers reported Brosius' harassment to Mendez and Courteville and that no action was taken by either of them to stop Brosius from harassing Weyers. In addition, as discussed above, there was evidence from which the jury could conclude that Mendez's reason for firing Weyers was pretext for age discrimination. There was also evidence of ageist comments by Courteville.

Under these circumstances, and viewing the evidence in the light most favorable to Weyers, the Court believes that a reasonable juror could have found that Lear knew that Brosius', Courteville's and Mendez's conduct was prohibited by the ADEA or showed reckless disregard for Weyers' federally protected rights. Accordingly, there is sufficient evidence to support the jury's finding on the issue of whether Lear committed a willful violation of the ADEA in harassing Weyers based upon her age.

The jury also awarded Weyers $500,000 in punitive damages on her MHRA age harassment claim. As noted above, under Missouri law, in order for an award of punitive damages to survive, the evidence presented must satisfy the clear and convincing standard of proof. *See Rodriguez,* 936 S.W.2d at 111. Missouri requires that punitive damages may only be awarded for " 'conduct that is outrageous, because of defendant's evil motive or reckless indifference to the rights of others.' " *Denesha,* ₊161 F.3d at 503 (citations omitted).

■ In this case, after reviewing the evidence, the Court agrees with Weyers that there was sufficient evidence to submit punitive damages on Weyers' MHRA harassment claim. The Court also concludes that the award is constitutionally permissible. *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

On the one hand, the harassment suffered by Weyers occurred over a short period of time. Weyers only worked for Lear for 90 days, and the evidence at trial suggested that she did not suffer harassment by Brosius during that entire length of time. On the other hand, the harassment involved physical contact (shoving, screw throwing), and public humiliation. The conduct was also intended to drive Weyers out of the work force. Lear had no policy against age discrimination and took no action when the problem was brought to its attention. There was also substantial evidence that age discrimination was wide spread in the rear seat work area, the place where Brosius and Mendez supervised Weyers.

■ Considering the factors identified in *Denesha,* Ross, and *BMW of North America, Inc.,* and recognizing that no mathematical formula is appropriate, the Court finds that an award of $500,000 on the MHRA harassment claim is constitutionally permissible. While this is a close case, the actual damages on the harassment claim is $125,000; thus the $500,000 punitive damage award and the $125,000 liquidated damages award is approximately four times the actual damage award on the harassment claim. This is well within the 10 to 1 ratio of *Ross* and *Kimzey,* and even the 4 to 1 ratio of *Watkins v. Lundell,* 169 F.3d 540 (8th Cir.1999). The award is also sufficiently substantial to deter future conduct of this kind by Lear, a large corporation with substantial resources, and is consistent with the $700,000 award in *Denesha.* Accordingly, viewing the evidence in the light most favorable to Weyers, the Court believes

the award of $500,000 in punitive damages on the MHRA age harassment claim is constitutionally permissible.[4]

### III. Legal Standard—New Trial

A new trial may be granted on the grounds that the verdict is so against the weight of the evidence that a new trial is necessary to avoid a miscarriage of justice. *Keeper v. King,* 130 F.3d 1309 (8th Cir.1997) (citations omitted). To determine if the new trial should be granted, "the trial court can rely on its own reading of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Harris v. Secretary, U.S. Dep't of the Army,* 119 F.3d 1313, 1318 (8th Cir.1997) (quoting *Ryan by Ryan v. McDonough Power Equip., Inc.,* 734 F.2d 385, 387 (8th Cir.1984)). In order to grant a new trial based on trial court error, the Court must determine that the evidentiary or instructional ruling was so prejudicial that retrial would likely produce a different result. *O'Dell v. Hercules, Inc.,* 904 F.2d 1194, 1200 (8th Cir. 1990).

### IV. Discussion—Lear's New Trial Motion

Lear argues that it is entitled to a new trial on Weyers' age harassment claim. Lear raises three arguments in support of its contention, which the Court will address in turn.

#### A. Whether Brosius was Weyers' Supervisor

Lear argues first that a new trial should be granted on Weyers' age harassment claim because the Court erred in ruling that Brosius was Weyers' supervisor. The outcome of this determination affected the jury instructions given on Weyers' harassment claim.

The first step in resolving the issues raised by Lear is to ascertain what test should be used to determine whether an employee is a "supervisor." Whether Brosius was a supervisor is particularly important because, under the Supreme Court's decisions in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), if he was, then Lear may be held vicariously liable for Brosius' discriminatory conduct. Lear acknowledges that neither the ADEA nor Title VII provide any definition of the term "supervisor." Moreover, the Court has been unable to locate any controlling authority which definitively answers this question.

In support of its position that Brosius was not a supervisor, Lear argues that cases addressing this question take guidance from the National Labor Relations Act ("NLRA"), as well as from the statutory framework of Title VII, and show that the essence of supervisory status is the authority to affect the terms and conditions of an employee's employment. Lear cites, for example, the Seventh Circuit's decision in *Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027 (7th Cir. 1998), which involved a hostile work environment claim under Title VII. In that case, which dealt with harassment by alleged supervisors, the court stated that "the touchstone for determining supervisory status is the extent of authority pos-

---

4. While the Court finds that the punitive damages awarded in the case are constitutionally permissible, it believes that the ADEA liquidated damages may be duplicative of the punitive damages award under the MHRA. Al-

ternatively, the Court believes that remittitur of the ADEA liquidated damages is required. (See discussion under subsection V of this opinion.)

sessed by the purported supervisor." *Id.* at 1033 (citing *Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1271 (10th Cir.1998) (the operative question in determining supervisory status is whether the employee in question "had sufficient control over the plaintiff to be considered her supervisor ...")). The court further concluded as follows:

> Hence, it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes of imputing liability to the employer.

*Id.* at 1034.

Lear has also directed the Court's attention to the Eighth Circuit's decision in *Beverly Enterprises–Minnesota, Inc. v. National Labor Relations Board,* 266 F.3d 785 (8th Cir.2001). In *Beverly,* a case brought under the NLRA, the court quoted the definition of a "supervisor" under the NLRA as follows:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

*Id.* at 788 (quoting 29 U.S.C. § 152(11)). The court in *Beverly* further elaborated that " 'so-called "straw bosses" are not necessarily supervisors even if they give minor orders or supervise the work of others.' " *Id.* (citing *Schnuck Markets,*

*Inc. v. National Labor Relations Board,* 961 F.2d 700, 703 (8th Cir.1992) (quoting *Phillips v. Kennedy,* 542 F.2d 52, 56 (8th Cir.1976))). Based on the guidance provided by the cases cited above and other similar cases, Lear, without suggesting a specific definition of the term "supervisor," contends that Brosius should not have been found to be a supervisor. In support, Lear points to testimony from Mendez that Brosius was not actually a supervisor and that he could not hire or fire workers or tell them what to do. [Tr. at 55, 76, and 104–07].

Although Lear attempts to frame the "supervisor" position as one requiring the power to hire and fire, the court is persuaded instead by the analysis in *Grozdanich v. Leisure Hills Health Center, Inc.,* 25 F.Supp.2d 953, 971 (D.Minn.1998). In *Grozdanich,* the district court stated:

> There is a more indulgent line of case authority which, prior to *Faragher* and *Ellerth,* maintained that a low-level superior, who retained something less than plenary authority over hiring and firing, could be considered a "supervisor" such that an employer would be vicariously liable for his acts of sexual harassment.

25 F.Supp.2d at 972 (listing cases). Moreover, this Court is persuaded, as the *Grozdanich* court was, that "[u]pon a close reading of the *Faragher* decision, it is evident that the Supreme Court views the term 'supervisor' as more expansive than as merely including those employees whose opinions are dispositive on hiring, firing, and promotion." *Id.*

The *Faragher* case involved allegations by a lifeguard that two of her superiors made lewd comments and engaged in uninvited and offensive touching of the plaintiff. One of those superiors had authority over hiring and firing, subject to approval of higher management officials. The other superior was a marine safety captain, who

was "responsible for making the life-guards' daily assignments, and for supervising their work and fitness training," but who apparently lacked any authority to hire or fire. *Faragher*, 524 U.S. at 781, 118 S.Ct. 2275.

As the Court in *Grozdanich* pointed out, in reversing and remanding the case to the district court for reinstatement of the judgment for the plaintiff, "the Supreme Court considered both employees to be 'supervisors,' and held the City liable for the hostile working environment that they had created." 25 F.Supp.2d at 972. In reaching its decision, the Court in *Faragher* observed that "supervisors have special authority enhancing their capacity to harass, and that the employer can guard against their misbehavior more easily because their numbers are by definition fewer than the numbers of regular employees." 524 U.S. at 800–01, 118 S.Ct. 2275. The Supreme Court further explained that "in implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by the abuse of his supervisory authority" because the victim may be "reluctant to accept the risks of blowing the whistle on a superior" and because "employers have greater opportunity and incentive to screen [supervisors], train them, and monitor their performance." *Id.* at 802–03, 118 S.Ct. 2275.

Given that the Supreme Court in *Faragher* considered an employee whose supervisory authority extended only to managing daily assignments and supervising subordinates' work and fitness training, to be a "supervisor," the Court clearly did not consider the power to hire and fire to be dispositive. In light of that consideration, this Court agrees with the *Grozdanich* court's conclusion, stated as follows:

> The disutility of drawing any distinction between supervisors who manage their subordinates' daily activities, but who can only recommend significant personnel decisions, and supervisors who have plenary authority over all such matters, underscores the Supreme Court's holdings in *Faragher* and *Ellerth*. A supervisor who sexually harasses an employee, even though he holds no dispositive say over that employee's employment status, is furthered in his capacity to harass by the power that he wields over the employee, ..., and the employer can and should guard against the supervisor's abuse of the very authority that the employer vested in its managers. To draw the distinction, that is urged by [the employer], would facilitate an employer to effectively insulate itself from the application of *Faragher*, and *Ellerth*, simply by directing all critical personnel decisions to be effected by a personnel department, which may have no direct, and only infrequent contact with the employee subject to the harassment.

25 F.Supp.2d at 973. As a result, the Court believes that supervisory status is a broader concept than suggested by Lear.

Without attempting to precisely define the term "supervisor," considering all the facts of this case, it is clear to the Court that Brosius was Weyers' supervisor during part of her employment with Lear. Despite his testimony that Brosius was not in fact a supervisor, Mendez also testified that Brosius "was viewed as a supervisor by the people" and that he was paid more than normal workers. [Tr. at 76:19–25]. Terilyn Fristoe ("Fristoe") also testified that Brosius was a "supervisor." [Tr. at 49:8–15]; and that he did evaluations for the people under him [Tr. at 55], or sat in on evaluations [Tr. 71]. In addition, Brosius directed Weyers in terms of where she was to work in the assembly process at Lear. He exercised control over the training that she received. He supervised her work and completed performance evaluations for Weyers—evaluations upon which

Mendez and Courteville relied in making their decisions. As Weyers points out, Luis Martinez ("Martinez"), Lear's Human Resources manager, testified that only "supervisors" were allowed to fill out performance evaluations. [Tr. at 234]. Moreover, while Brosius may not have had the ultimate power to hire or fire, Fehr testified that Brosius had the power to "recommend" whether an employee should be fired. In short, the record supports a finding that Brosius' opinions of an employee's performance had an effect on decisions to terminate employees.

Ultimately, while Lear would have the Court draw lines in the sand and define the term "supervisor" narrowly, the Court believes it is more appropriate to look at the real life working environment of an employee rather than artificial demarcations of authority. Based on the evidence presented in this case, the Court believes Brosius had the ability to make consequential employment decisions and to affect the terms and conditions of Weyers' employment, as a result of the special authority conferred on him by Lear. He was Weyers' supervisor for purposes of this case.

The Court's conclusion, however, that Brosius was a "supervisor" does not resolve the issue. Lear also argues that the Court erred by deciding the "supervisor" question at all. It suggests instead that the determination was a question of fact for the jury. The Court disagrees. While the Court has been unable to locate any controlling authority directly resolving this question, the Court believes that the Eighth Circuit's decision in *Todd v. Ortho Biotech, Inc.*, 175 F.3d 595 (8th Cir.1999), may provide some guidance.

In that case, after a jury trial on the plaintiff's sexual harassment claim, the Eighth Circuit remanded the case in light of the Supreme Court's rulings in *Ellerth* and *Faragher*. In its opinion, the court noted that the "*Ellerth/Faragher* vicarious liability standard is limited to cases of harassment by a 'supervisor with immediate (or successively higher) authority over the employee.'" *Todd*, 175 F.3d at 598. The court further noted that the Supreme Court did not "further explain what it meant by 'supervisor.'" *Id.* The court in *Todd* then determined that "[t]he contours of the term 'supervisor' as used in the new *Ellerth/Faragher* standard is another question more appropriately addressed by the district court in the first instance." *Id.*

In addition, the Court believes that the inquiry into whether someone is a supervisor versus a co-worker is similar to the inquiry made by courts regarding whether an individual is an employee or an independent contractor. It has routinely been noted that that determination is a question of law for courts to decide. *See Schwieger v. Farm Bureau Ins. Co. of Nebraska*, 207 F.3d 480, 483 (8th Cir.2000) (affirming district court decision that plaintiff was an independent contractor and dismissing sex discrimination case); *Kirk v. Harter*, 188 F.3d 1005, 1007 (8th Cir.1999) ("[W]hether a given individual is an employee or independent contractor is a question of law, which must be decided by reviewing the particular facts of each case"); and *Berger Transfer & Storage v. Central States, Southeast and Southwest Areas Pension Fund*, 85 F.3d 1374, 1377–78 (8th Cir.1996) ("the ultimate conclusion as to whether an individual is an employee or an independent contractor is a question of law").

It is important that terms such as "employee/independent contractor" and "employee/supervisor" be determined uniformly. Left to the jury, the same individual may be found to be a supervisor in one lawsuit and not in another. Moreover, there are practical considerations. If the supervisor question is left to a jury, the Court would need to submit alternative verdict directing instructions. In one set,

the jury would apply the *Faragher* affirmative defense and the burden would be on the defendant to prove plaintiff had failed to take advantage of the employer's discrimination complaint procedure. If the jury found that the harasser was not a supervisor, then the burden would be on the plaintiff to prove the employer's knowledge of the harassment and a failure to reasonably respond. This would further complicate the jury instructions in what can already be a complicated area for both judge and jury. Thus, the Court does not believe it was error for the Court to determine whether Brosius was a "supervisor".

■■■ Even if it was error for the Court to determine Brosius' supervisory status, the Court believes that Lear failed to preserve its objection on this issue. Contrary to its assertion otherwise, and despite the Court's invitation during trial to do so, Lear did not submit any proposed instruction defining the term "supervisor." The only instruction proposed by Lear on Weyers' age harassment claim, was based upon Instruction 5.42 of the Eighth Circuit Model Civil Jury Instructions which assumes that Brosius was a supervisor. Moreover, the verdict directing instruction which the Court submitted to the jury on Weyers' age harassment claim was nearly identical to Lear's proposed instruction. [*Compare* Doc. 67, Jury Instruction No. 16 and Doc. 56, Dft's Proposed Instructions]. Lear asserts that it submitted alternative instructions on this claim, including a version based upon Eighth Circuit Model Instruction 5.43, which addresses the elements of a sexual harassment claim where the harassment is by a non-supervisor. The Court, however, does not find any such proposed instruction in the record. In addition, Lear's proposed jury instructions include an instruction on the affirma-

tive defense enunciated in *Faragher*. As discussed above, such an instruction is necessary only if harassment by a "supervisor" was involved; Lear's proposal of that instruction further undermines its present argument that Brosius should not have been found to be a supervisor by the Court.[5] Accordingly, based on the foregoing, the Court does not believe that a new trial is warranted based upon the Court's determination at trial that Brosius was Weyers' supervisor.

## B. Denial of Lear's Request to Cross–Examine Weyers About Prior Inconsistent Statements

Lear next argues that the Court abused its discretion and that a new trial is necessary because the Court denied Lear the opportunity to cross-examine Weyers based upon certain prior inconsistent statements. The Court disagrees.

■■■ Both parties agree that "[d]ecisions about the admissibility of evidence during trial are within the trial court's broad discretion" and decisions to exclude evidence are reviewed for abuse of discretion. *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 467 (8th Cir.2000). Moreover, even if the Court improperly excluded evidence at trial that Lear wished to submit, a new trial is not warranted unless the Court's rulings affected its substantial rights. *See Williams*, 223 F.3d at 755 (citation omitted). "Evidentiary errors affect a party's substantial rights when the cumulative effect of the errors is to substantially influence the jury's verdict." *Id.* (citing *Nichols v. American Nat'l Ins. Co.*, 154 F.3d 875, 889 (8th Cir.1998)). In this case, the Court believes exclusion of the evidence at issue was proper and that even

---

5. Lear seems to suggest, in footnote 1 of its Reply brief, that the Court should not have given the *Faragher* affirmative defense instruction. Lear may be correct, but any error benefitted Lear and would not be the basis for a new trial.

if it was not, exclusion of the evidence did not affect Lear's substantial rights.

Lear argues that Weyers' counsel was allowed to refresh Weyers' recollection on the stand with certain handwritten notes previously made by Weyers. [Tr. at 305–15]. Lear contends that the notes at issue are admissions and that they were provided to the EEOC and the MCHR. If allowed to impeach Weyers with the notes, Lear suggests that it would have been clear that the prior statements contained countless inconsistencies that directly contradicted Weyers' sworn statements at trial. [See Dft's Sugg. at 19]. Lear compares the instant case to that in *Arnold v. Groose*, 109 F.3d 1292 (8th Cir. 1997).

In *Arnold*, which involved an action under 42 U.S.C. § 1983 by a prisoner against prison officials, the defendants, in an effort to impeach Arnold, sought to introduce portions of Arnold's "handwritten pro se pleadings from an earlier suit ... filed arising out of the same nucleus of facts at issue in this case and which had been consolidated with the action tried." *Id.* at 1295. The district court did not admit the evidence. In ruling on a motion for new trial, the district court stated that the evidence was excluded because it was "irrelevant." *Id.* at 1296. The appellate court determined that the district court's decision amounted to error, as the evidence was relevant, and remanded the case for a new trial. *Id.* at 1297. In so doing, the Eighth Circuit pointed out that the "entire case depended on the credibility of Arnold's testimony." *Id.* at 1296. The defendants sought to introduce the evidence of Arnold's prior statements in part because of information that was omitted from the prior statements. The court noted that "[i]f in fact those omitted events had indeed occurred, one would assume they would have been the most important facts to recite in support of his claim ...." *Id.*

The court also noted that the statements at issue were admissions, "at least the first of which was made under penalty of perjury." *Id.*

The instant case, while somewhat analogous to *Arnold*, is distinguishable. First, the notes which Lear sought to introduce in an effort to impeach Weyers were in fact different notes from those used to refresh Weyers' recollection. [See Tr. at 305–15, 356–63, 404–05, Dft's Exh. 36 and Dft's Exh. 39]. Weyers testified that the notes used to refresh her recollection were contemporaneous notes of events that occurred during her employment. The notes which Lear sought to use to impeach Weyers, however, were prepared after her termination. Second, and most important, the Court did not exclude Weyers' notes because they were irrelevant. The Court was concerned because of the first page of Lear's Exhibit 36. The first page talks about how Weyers was treated differently than three men. Weyers' counsel had previously stated that Exhibit 36 was produced to the EEOC when Weyers was claiming sex discrimination and harassment. The Court did not want to confuse the jury with the sex discrimination claims given that summary judgment had already been granted on those claims, [Tr. at 356–62], and did not want to admit an exhibit that contained an EEOC Charge. The Court had previously ruled that neither Lear nor Weyers could introduce evidence concerning the EEOC Charge.

"Under Rule 403, the court can and should exclude otherwise relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Cummings v. Malone*, 995 F.2d 817, 823 (8th Cir.1993) (citations omitted). The Court believes that the instant case presented a situation in which Rule 403 required the Court to exclude the evi-

dence of Weyers' prior statements in an effort to prevent unfair prejudice and confusion. Although Lear believes that *Arnold* dictates a different result, the Court notes that in *Arnold*, "[a]t no time during trial was the proffered evidence attacked as being confusing for the jury under Federal Rule of Evidence 403." *Arnold*, 109 F.3d at 1296. Furthermore, Lear had many other opportunities at trial to impeach Weyers' credibility, and her statements concerning Brosius' conduct were corroborated by other witnesses, including witnesses who still work for Lear. There was no miscarriage of justice which resulted from the exclusion of the evidence at issue; a new trial will therefore be denied.

### C. Admission of Statements by Weyers' Co-workers

The final point raised by Lear concerns the Court's admission of testimony from plaintiff's witnesses, including Fristoe, Lamar and William Wilson, about how other Lear employees were discriminated against and harassed by supervisors at Lear. Lear contends that the evidence at issue was irrelevant and that the prejudice which resulted from the testimony far outweighed its probative value.

The Eighth Circuit has held that evidence of harassment and discrimination directed toward other employees is relevant to whether an employer "maintained a hostile work environment, whether it intended to harass and discriminate against [people in the plaintiff's protected class], and whether [the employer's] justifications for its refusal to discipline [the plaintiff's] harassers ... were pretextual." *Madison*, 257 F.3d at 793. The court in *Madison* upheld the trial court's admission of such evidence where "[t]he evidence relating to other employees was not extensive compared to the amount of evidence about conduct directed at [the plaintiff] herself ...." *Id.* at 794.

The Court believes that the evidence in this case predominately related to conduct directed toward Weyers. Having listened to the evidence and reviewed the record, the Court believes that Weyers' co-workers' statements were relevant and no undue prejudice resulted from their admission. Accordingly, Lear's request for a new trial will be denied.

### V. Remittitur

"Missouri places no set limit on punitive damage ...." *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 576 (8th Cir.1997). The trial court, however, must determine whether an award of punitive damages is constitutionally permissible. *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041 (8th Cir.2002), and whether the award is an abuse of discretion. *Call v. Heard*, 925 S.W.2d 840, 849 (Mo.1996) (en banc). To determine if the punitive damage award is an abuse of discretion, the court should consider "the degree of malice or outrageousness of the defendant's conduct", "aggravating and mitigating circumstances", the "defendant's financial status", the character of both parties, the injuries suffered, the defendant's standing or intelligence and the relationship between the two parties. *Id.* at 849. A punitive damage award is an abuse of discretion when its size "reveals 'improper motives or a clear absence of the honest exercise of judgment'". *Callantine v. Staff Builders, Inc.*, 271 F.3d 1124, 1133 (8th Cir.2001) (quoting *Call v. Heard*, 925 S.W.2d 840, 849 (Mo.1996) (en banc)).

Considering these factors, the Court orders remittitur in the amount of $68,962 on Weyers' termination claim (an amount equal to the ADEA liquidated damages) and $225,000 on Weyers' harassment claim (an amount equal to the ADEA liquidated damages plus a $100,000 remittitur on the MHRA punitive damage award). In the

absence of this remittitur, the amount of Plaintiff's judgment would be a "plain injustice" or a "shocking result". *See Slatton v. Martin K. Eby Construction Co.,* 506 F.2d 505, 508 (8th Cir.1974); *Morse v. Southern Union Company,* 174 F.3d 917, 925 (8th Cir.1999). In reaching this conclusion, the Court has considered that the Defendant is a large corporation with substantial resources, yet lacked any age discrimination policy, and permitted supervisors' obvious discriminatory attitudes and actions to go unchallenged. On the other hand, Weyers' hostile work environment only lasted 90 days and there was a possibility of double counting damages given the overlap in the evidence. As previously mentioned, Weyers' punitive/liquidated damages are about four times larger than her actual damages, but her actual damages on the harassment claim are based on pain and suffering, a difficult area to value.

The Court has also considered the fact that the jury was not aware of the consequences of its finding of willfulness. In Instruction No. 19, the jury was asked whether Lear willfully discriminated against Weyers based on her age. The jury found that Lear's discrimination had been willful, both as to the termination claim and the harassment claim. That finding of willfulness entitled Weyers to liquidated damages under the ADEA equal to her actual damages. On her ADEA termination claim, that was $68,962, and on her ADEA harassment claim, $125,000. As previously indicated, it is proper for the Court to enter that award once a jury finds the factual predicate of willfulness. The complication in this case, however, is that the MHRA also permits an award of punitive damages and the Court believes that the ADEA liquidated damages may be duplicative of the MHRA punitive damages. *See Nelson v. Boatmen's Bancshares, Inc.,* 26 F.3d 796, 803 (8th Cir. 1994); *but compare Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684

(1959); *Turley v. Wyrick,* 554 F.2d 840 (8th Cir.1977) (holding that each sovereign has a right to enforce its laws independently). Even if both punitive and liquidated damages are generally permissible, it would be an abuse of discretion to permit them in this case where the jury was not told that its finding of willfulness would result in liquidated damages in addition to the punitive damages they assessed under the MHRA.

In retrospect, the Court believes it would have been better for the instructions to inform the jury that a finding of willfulness required the imposition of liquidated damages equal to actual damages. In the absence of such a warning, the jury returned a verdict, including its finding of willfulness, that shocks the conscience.

Given all these factors, the Court concludes that this is an appropriate case for remittitur. Weyers is given the option of either a new trial on the issue of punitive and liquidated damages or accepting remittitur in the total amount of $293,962. If Weyers accepts remittitur, she will be entitled to total judgment in the amount of $718,962, which is broken down as follows: Termination claim—actual damages $68,962, punitive damages under the MHRA $125,000; Harassment claim—actual damages $125,000, punitive damages under MHRA $400,000. The issue of attorney's fees will be addressed in a separate order. Accordingly, it is hereby

ORDERED that Lear's Motion for Judgment as a Matter of Law or in the Alternative for New Trial [Doc. 72] is DENIED. Weyers is given seven days from the date of this Order to notify the Court in writing whether she agrees to remittitur in the amount of $293,962. If she agrees to remittitur, the Clerk is ordered to enter judgment in favor of Weyers in the amount of $718,962, per this Order. If she rejects remittitur or fails to respond within

seven days, a new trial is ordered on the issue of punitive and liquidated damages only.